**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>STATE OF COLORADO, *ex rel.* PHILIP J. WEISER, ATTORNEY GENERAL,<br><br>　　Plaintiffs,<br><br>　　　v.<br><br>GREYSTAR REAL ESTATE PARTNERS, LLC, d/b/a "Greystar," a limited liability company;<br><br>GREP GENERAL PARTNER, LLC, d/b/a "Greystar," a limited liability company;<br><br>GREYSTAR MANAGEMENT SERVICES, LLC, d/b/a "Greystar," a limited liability company;<br><br>GREYSTAR RS NATIONAL, LLC, d/b/a "Greystar," a limited liability company;<br><br>GREYSTAR CALIFORNIA, INC., d/b/a "Greystar," a corporation;<br><br>GREP SOUTHWEST, LLC, d/b/a "Greystar," a limited liability company,<br><br>　　Defendants. | **Case No. 1:25-cv-165**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission") and the State of Colorado, *ex rel.* Philip J. Weiser, Attorney General ("State of Colorado"), for their Complaint allege:

　　1.　　The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6801-6809,

§§ 6821-6827. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 521 of the GLB Act, 15 U.S.C. § 6821.

2.      The State of Colorado brings this action for Defendants' violations of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.* For these violations, the State of Colorado seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief pursuant to Colo. Rev. Stat. §§ 6-1-110 and 112.

## SUMMARY OF THE CASE

3.      Since at least 2019, Defendants (collectively referred to as "Greystar") have used deceptive advertising to entice consumers into applying for rental housing, and then bilked those consumers out of hundreds of millions of dollars by charging "Hidden Fees" (mandatory, fixed fees that are not included in the advertised price) for itself and its landlord clients.

4.      As the largest multi-family rental property manager in the United States, Greystar operates as the link between property owners and their tenants. Greystar is responsible for advertising available units at the properties it manages. Greystar is also responsible for finding qualified tenants to apply for available units. After a unit is filled, Greystar communicates with and collects the rent and Hidden Fees from the tenant on behalf of the owner.

5.      Greystar advertises its available apartments widely. Greystar knows that price is the most important factor for the majority of consumers searching for an apartment, and the rental price is a key aspect of Greystar's apartment listings. Despite this, Greystar consistently omits various mandatory fees from the advertised price. Simply put, consumers cannot lease a Greystar-managed apartment by paying only the advertised price.

2

6.      Property owners pay Greystar a portion of all money that tenants pay to live in the properties Greystar manages, including rent, Hidden Fees, late fees, and forfeited security deposits.  Accordingly, the more money tenants pay to lease a unit in a property managed by Greystar, the more money Greystar collects as compensation.  Under the guise of a cheaper "rent" promoted in its advertisements and posted on its property websites, Greystar can thus attract greater numbers of interested consumers to apply for its properties, potentially increasing the revenues for a given property through increased tenancy.

7.      After attracting prospective tenants with deceptively low rental prices, Greystar continues to misrepresent the true cost of renting a unit at its properties on the property websites and application portals.  In the most egregious examples, Greystar did not disclose any of the Hidden Fees it charges until after prospective tenants paid to apply and, if approved, received a forty- to sixty-page lease package.  In other instances, Greystar provided prospective tenants with information about most (but not all) Hidden Fees only after prospective tenants entered their contact information and opened an online account.  In yet other instances, Greystar listed most (but not all) Hidden Fees only after prospective tenants selected a floor plan and lease length in the application portal, and even then the fees may have been concealed behind hyperlinks.  Even for webpages where Greystar now lists Hidden Fees before tenants apply, the fee information is confusing and often contradicts other representations on the webpage – and the advertised price still excludes the fees.

8.      In all of these scenarios, by misrepresenting information that is essential for prospective tenants to understand their actual monthly leasing cost, Greystar effectively stifles

prospective tenants' ability to choose a unit that will fit within their budget and accurately comparison shop between apartment listings.

9.    Prospective tenants have limited options for recourse.  If a prospective tenant realizes the true price before signing a lease and attempts to withdraw their application, they are unable to recoup the hundreds of dollars they paid during the application process.  If a tenant who has already signed a lease wants to cancel after discovering the true price, Greystar charges significant lease termination fees, often totaling thousands of dollars.  Given the sizeable termination fees, the inability to recoup money already spent, and the difficulty of finding a new home, most tenants are effectively locked into leases that require them to pay the higher-than-advertised cost.  Accordingly, Greystar's deceptive advertising means individual tenants are on the hook for hundreds, if not thousands, of dollars more than they anticipated.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over the FTC's claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and this Court has supplemental jurisdiction over the State of Colorado's claims pursuant to 28 U.S.C. § 1367(a).

11.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), and (c)(2), and 15 U.S.C. § 53(b).

## PLAINTIFFS

12.    The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC

also enforces Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a)(2), which prohibits "making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution" "to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution."

13.     The State of Colorado brings this action by and through Attorney General Philip J. Weiser pursuant to the CCPA, Colo. Rev. Stat. §§ 6-1-101 *et seq*., which prohibits unfair and deceptive trade practices in the course of a defendant's business or occupation. The CCPA authorizes the Colorado Attorney General to seek, and the Court to grant, civil penalties, injunctive relief, and such orders as may be necessary to prevent the use or employment of deceptive trade practices, to completely compensate or restore to the original position of any person injured, or to prevent any unjust enrichment. Colo. Rev. Stat. §§ 6-1-110, 112.

## DEFENDANTS

14.     Defendant Greystar Real Estate Partners, LLC ("GREP LLC"), also doing business as "Greystar," is a Delaware corporation with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. GREP LLC is a multi-family rental property owner, developer, and manager, with offices located across the United States. Alongside Defendant GREP General Partner, LLC, and through its subsidiaries, GREP LLC manages rental properties across the United States. It conducts its property management business through a web of subsidiaries, including Defendants Greystar Management Services, LLC, Greystar RS National, LLC, Greystar California, Inc., and GREP Southwest, LLC. At all times material to this Complaint, GREP LLC has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District

and throughout the United States.  See Exhibit A for an organization chart depicting the entities named as Defendants in this Complaint.

15.     Defendant GREP General Partner, LLC ("GREP General Partner"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403.  At times material to this Complaint, through its role as general partner in Greystar Management Services, LP (predecessor to Greystar Management Services. LLC) and other Greystar-related limited partnerships, GREP General Partner has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States.

16.     Defendant Greystar Management Services, LLC ("GS Management Services"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403.  GS Management Services is a subsidiary of GREP LLC.  At times material to this Complaint, GS Management Services operated as Greystar Management Services, LP, a limited partnership, in which GREP LLC held a 99 percent interest and GREP General Partner owned a 1 percent interest as general partner.  At all times material to this Complaint, GS Management Services has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States.  Together with Defendant Greystar RS National, LLC, and through its subsidiaries, GS Management Services acts as property manager for over 800,000 rental units nationwide (including apartments and beds in student housing properties).  At all times material to this Complaint, GS Management

6

Services has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

17.    Defendant Greystar RS National, LLC ("RS National"), also doing business as "Greystar," is a Delaware limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. RS National is a wholly owned subsidiary of GREP LLC. At all times material to this Complaint, RS National has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States. Together with Defendant GS Management Services, and through its subsidiaries, RS National acts as property manager for over 800,000 rental units nationwide (including apartments and beds in student housing properties). At all times material to this Complaint, RS National has controlled the acts and practices of its subsidiaries described below and approved of or benefited from such subsidiaries' acts and practices at issue in this Complaint.

18.    Defendant Greystar California, Inc. ("Greystar California"), also doing business as "Greystar," is a Delaware corporation with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403. Greystar California is a wholly owned subsidiary of JPI Management Service, LP, a Delaware limited partnership. JPI Management Service, LP is, in turn, a subsidiary of Greystar Acquisition LLC (which holds a 99 percent interest) and Defendant GREP General Partner (which holds a 1 percent general partner interest). Greystar Acquisition, LLC, a Delaware limited liability company, is a wholly owned subsidiary of Defendant GS Management Services. Greystar California contracts directly with property owners to manage rental properties located in the state of California. As part of its management

responsibilities, and at all times material to this Complaint, Greystar California has advertised, marketed, promoted, and offered apartment and residential units to consumers throughout the United States and leased and managed the rental of residential units to consumers in California.

19.     Defendant GREP Southwest, LLC ("GREP Southwest"), also doing business as "Greystar," is a limited liability company with its principal place of business at 465 Meeting Street, Suite 500, Charleston, South Carolina 29403.  GREP Southwest is a wholly owned subsidiary of Defendant GS Management Services.  GREP Southwest contracts directly with property owners to manage rental properties located in Arizona, Colorado, Hawaii, Iowa, Nebraska, Nevada, New Mexico, Oklahoma, Oregon, and Utah.  As part of its management responsibilities, and at all times material to this Complaint, GREP Southwest has advertised, marketed, promoted, offered, leased, and managed the rental of apartment and residential units to consumers in this District and throughout the United States.

## COMMON ENTERPRISE

20.     Defendants GREP LLC, GREP General Partner, GS Management Services, RS National, Greystar California, and GREP Southwest have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, and office locations, and unified advertising and internal operating policies and procedures.  Because these Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

**COMMERCE**

21.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**DEFENDANTS' BUSINESS ACTIVITIES**

*A.  Greystar's Property Management Services*

22.     Greystar brands itself as "The Global Leader in Rental Housing" and touts that it is the "largest operator of apartments in the United States."  As of January 1, 2024, Greystar managed more than 800,000 rental units nationwide (including apartments and beds in student housing properties).  Greystar operates multi-family residential rental buildings and complexes, as well as active adult and student communities.  The National Multifamily Housing Council ("NMHC") repeatedly has named Greystar as the largest multi-family rental property manager in the United States, including in 2024.

23.     Greystar also promotes itself as the "#1 owner" of rental apartments in the United States.  According to NMHC's 2024 rankings, which are based on data submitted by property owners and define ownership as "exercis[ing] effective control over the asset," Greystar owns over 100,000 residential rental units nationwide.  Greystar is also involved in the ongoing construction and development of apartment complexes in the United States and worldwide.

24.     Greystar offers "end-to-end property management services" and promotes its analytics and operational consistency, including standardized operating procedures and economies of scale, as a unique benefit of hiring Greystar as a property manager.

25.     Greystar provides property management services for rental properties it owns through its subsidiaries and joint ventures, as well as for properties owned by other individual and corporate landlords (rental properties managed by Defendants, whether or not owned by Greystar, are collectively referred to as "Greystar Managed Properties").

26.     When a Greystar-owned property is involved, generally one of Greystar's regional property management subsidiaries will enter into an agreement to provide services to the Greystar subsidiary that holds title to the property.

27.     Defendants enter into property management agreements ("PMAs") with the owners of all Greystar Managed Properties.  Where properties are owned by Greystar, Defendants enter into PMAs with the relevant Greystar subsidiary or holding company that holds title to the property.  The PMAs lay out Greystar's duties to the property owners, including Greystar's responsibility for leasing, marketing, tenant relations, and day-to-day operations at the subject property.  Greystar's PMAs with Greystar-owned properties do not vary significantly from its PMAs with properties owned by third parties.

28.     Greystar offers a wide range of property management services to its clients. Pursuant to the PMAs, Greystar is generally responsible for:

      a.     advertising available rental units;

      b.     ensuring the information displayed on property websites is accurate;

      c.     communicating with current and prospective tenants;

      d.     leasing rental units to qualified tenants;

      e.     billing tenants and collecting payments;

      f.     marketing properties and maintaining property websites;

g.   hiring and training all on-site personnel at the property;

h.   entering into contracts with third-party service providers as the property owner's agent;

i.   maintaining apartment units and property premises in a habitable condition;

j.   developing an annual budget for each property and submitting quarterly or annual reports to property owners; and

k.   ensuring the collection of tenants' monthly payments.

29.   Greystar also offers post-tenancy services to pursue debts owed by former tenants.

30.   As property manager, Greystar is responsible for all tenant relations on behalf of the property owner.  In most circumstances, Greystar is the main point of contact for consumers interested in renting a unit at Greystar Managed Properties and for tenants residing in those properties.

31.   In exchange for these services, property owners generally pay Greystar the greater of a flat fee or a percentage of the Greystar Managed Property's gross rental revenue. Depending on the specific agreement between Greystar and the property owner, the calculation of the gross rental revenue may include *all* nonrefundable amounts collected from tenants, including any Hidden Fees charged to tenants.

### B. Greystar Deceptively Advertises Rental Prices and Hides Mandatory Fees

32.   Greystar deceptively advertises monthly leasing costs that are lower than the actual price tenants must pay to lease Greystar rental units.  The actual price is higher than the advertised price because Greystar adds on numerous mandatory fees.  In addition to advertising

deceptively low rental prices, Greystar fails to adequately inform prospective tenants about these fees.

### i.    The True Cost of Renting at a Greystar Managed Property Includes Hidden Fees

33.    Greystar falsely advertises that prospective tenants can lease a unit at a Greystar Managed Property for a set monthly "rent" figure.  Greystar fails to inform prospective tenants that, on top of the advertised rent amount, tenants are required to pay a slew of Hidden Fees to reside in a Greystar Managed Property.  Added together, these Hidden Fees can significantly increase the cost of renting a unit at a Greystar Managed Property by tens to hundreds of dollars each month, amounting to hundreds or thousands of dollars each year.

34.    Greystar often internally refers to the rent price, exclusive of Hidden Fees, as "base rent."  In its public-facing websites and advertisements, starting in approximately early 2024, Greystar began identifying the advertised price as a "base" figure, but still fails to adequately inform prospective tenants about the actual cost to rent a unit including associated Hidden Fees.

35.    The Hidden Fees vary depending on the specific Greystar Managed Property, but typical examples include:

      a.    valet trash fees (often $25-35 per month, in addition to any separate charge for residential trash collection);

      b.    package delivery or package concierge fees (generally $15-20 per month);

      c.    media and/or smart home technology package charges (ranging from $75-175 per month);

d.     fixed charges for common area utilities or maintenance (generally $15-25 per month);

e.     monthly administrative fees for the dissemination of utility bills on top of the tenant's portion of the utility charges (often between $4-8 per month), and one-time administrative fees to set up and close these utility billing accounts (generally $10-20 each);

f.     real estate taxes or local ordinance fees (often ranging from $5-25 per month);

g.     monthly "validation" fees if a tenant chooses to enroll in a renter's insurance plan other than Greystar's default provider (generally $3 per month); and

h.     pest control fees (typically between $2-5 per month).

36.    Greystar's Hidden Fees can take other forms as well.  For example:

a.     At some Greystar Managed Properties, Greystar bundles several Hidden Fees together and refers to them collectively as an "Amenity Fee," "Community Fee," or "Lifestyle Fee."

b.     In some cases, Greystar charges tenants monthly for "Miscellaneous Fees" or "Miscellaneous Income."  These fees may cover one or more of the above-described services, but they are assessed without further explanation on the tenant's monthly account statement.

37.    In some instances, the Hidden Fees are associated with services that are advertised as amenities without any mention of an additional cost for the service (for example,

13

some of the technology packages) or with services that relate to the basic maintenance and logistics associated with property management (for example, utility billing or pest control).

38.     Greystar tenants must pay for the services described above, even if the tenants neither want nor use the services.

39.     Greystar advises property owners about which mandatory ancillary services to include at their properties.  Greystar also assists property owners in deciding the amount to charge tenants for those services.

40.     Current and former Greystar executives have publicly touted Greystar's ability to obtain ancillary income for property owners through the mandatory imposition of these services and their associated fees.  Several third-party service vendors contracted by Greystar also promote their services, such as valet trash or package delivery, as a means of acquiring extra income from tenants on top of rent.

41.     Property owners are not the only ones benefitting from the mandatory imposition of these ancillary services and their associated fees.  Because Greystar generally receives a percentage of all nonrefundable amounts paid by tenants, the more fees Greystar Managed Properties charge, the more money Greystar makes as well.  For at least one preferred ancillary service vendor, Greystar also receives a percentage of all amounts paid by properties to the service vendor, which is based on the total number of units at Greystar Managed Properties that mandate the service for tenants.

42.     Indeed, between August 2019 and August 2022, on behalf of the property owners, Greystar collected more than $100 million in Hidden Fees from tenants at Greystar Managed Properties in California, Colorado, Nevada, and Utah alone.

### ii.    Greystar's Deceptive Rental Listings

43.    Pursuant to its PMAs, Greystar is responsible for advertising and marketing Greystar Managed Properties in order to fill available units.  Greystar relies heavily on online advertising to attract prospective tenants.  While Greystar's rental listings and advertisements vary based on the platform and property, Greystar consistently misrepresents the total cost of living at a Greystar Managed Property by excluding Hidden Fees from the advertised cost.

44.    Greystar advertises Greystar Managed Properties through several online platforms.  Greystar maintains websites for properties it manages (*see* Section B(ii)(b) below), as well as its own general brand website, Greystar.com (*see* Section B(ii)(c) below).  Greystar also contracts with third-party internet listing websites, such as Apartments.com and Zillow.com, to advertise Greystar Managed Properties and their available units.  *See* Section B(ii)(a) below.

45.    Millions of prospective tenants learn about and connect with the properties over the internet.  Greystar encourages all its prospective tenants to complete rental applications through an online portal affiliated with the individual property website.

46.    Greystar does not provide a total monthly leasing price, inclusive of all mandatory fees, in its external advertisements or on its property websites.  For some Greystar Managed Properties from at least August 2019 until late 2024, Greystar provided fee information only after prospective tenants had completed the entire application process and paid an application fee.  For nearly every other Greystar Managed Property, Greystar withheld fee information until after prospective tenants identified a floor plan and selected a lease duration.  Even then, however, Greystar often still failed to include the *full* range of Hidden Fees and thus continued to misrepresent the total monthly cost of renting a unit.

47.    Moreover, while some third-party internet listing sites have designated sections on their listing templates for all "fees" associated with a property or a unit, Greystar does not ensure that these sections accurately list *all* the fees Greystar charges.  Without complete information, the rental prices that Greystar lists for its units on third-party sites are inaccurate.

a.    <u>Internet Listing Services</u>

48.    Greystar contracts with several internet listing services ("ILSs") and their affiliates, including Zillow.com and Apartments.com, to advertise available units at Greystar Managed Properties on behalf of property owners.  Since at least August 2019, Greystar's listings on the ILSs generated millions of leads, and several hundred thousand consumers leased units at Greystar Managed Properties after expressing interest in a property through an ILS.

49.    Greystar directs information about Greystar Managed Properties to the ILSs, including information about pricing, availability, and fees.  That information then populates into a preexisting template advertising the Greystar Managed Property.  Greystar regularly updates this information as circumstances change.  Greystar is also able to manually edit various text fields which are used to provide additional information about the property on the ILS listings.

50.    Greystar actively monitors these listings.  In fact, Greystar instructs its regional property managers and on-site personnel to regularly check their relevant ILS property listings.  Thus, Greystar is aware, or should be aware, that the listings do not include an accurate monthly price, and that neither the "fees" sections nor the manually editable text fields on its listings provide a complete list of fees charged at a property.

51.    When a prospective tenant visits a Greystar listing on an ILS – whether they searched for the property through a search engine or found the property while searching the

listing site – they can review basic details about the property.  The listing may describe amenities available at the property, as well as the types of units available.

52.     Greystar's ILS listings show a rent price or range of rent prices for each available unit or floorplan, with individual unit prices dependent on the size, move-in date, and other unit-specific features.  The advertised price in these listings does not include Hidden Fees, and therefore misrepresents the true minimum price to rent the unit.  If a prospective tenant selects a specific unit on the ILS listing, the unit listing pop-up, seen in Figure A below, is also silent about the Hidden Fees that tenants are required to pay.



**Fig. A: Screenshot excerpt from Zillow.com listing for Broadstone on 9th property (Feb. 2024)**

53.     Some ILS sites include designated sections for "policies" or "fees."  The listing may even include a "rental costs and fees" calculator where a prospective tenant purportedly would be able to determine their estimated total cost of renting a unit.  As of early 2024, some

ILS listings now include a small and vague notation that their data is limited to information provided by the property, and as such the costs may not include all mandatory fees.

54.    Greystar's ILS listings generally do include information about optional fees, such as parking, pet, or storage fees, as well as one-time application and administrative fees. Greystar's ILS listings consistently omit the mandatory Hidden Fees, however, even where a listing includes a specific section for fees, like in the rent calculator shown in Figure B below. As a result, Greystar's ILS listings repeatedly misrepresent the total monthly cost of renting a unit.

55.    For example, as of August 2023, tenants at the Broadstone on 9th building in Denver, Colorado, were required to pay $25 per month for valet trash service, $5 per month for pest control, and $5.40 per month for utility administration, on top of their monthly rent and variable utility bills.  Broadstone on 9th tenants also pay a one-time package locker set-up fee ($20), as well as one-time utility administration account set-up and closing fees ($20 each).

56.    Yet, as shown in Figures A and B, the listings that Greystar populates on Zillow.com for this property do not disclose any of these fees.  Greystar fails to do so, despite Zillow.com providing a specific section to itemize fees and provide prospective tenants with an estimated monthly cost.

//



**Fig. B: Screenshot excerpt from Zillow.com listing for Broadstone on 9th property (Feb. 2024)**

57.     Greystar also fails to provide mandatory monthly fee information in the "Fees and Policies" section of its Broadstone on 9th listings on Apartments.com, as shown in Figure C, instead listing only move-in fees and optional parking, pet, and storage fees.



**Fig. C: Screenshot excerpt from Apartments.com listing for Broadstone on 9th (Feb. 2024)**

58.     Prospective tenants can express interest and submit their contact information through the ILS listing in order to be contacted about the property from Greystar.

59.     Greystar's ILS listings do not provide prospective tenants with reliable information about what fees apply, even though Greystar knows this information when posting a unit for rent. If a tenant follows up by reviewing the property website for their specific property, as described below, they would often find no additional information about the true monthly cost.

b.     Individual Property Websites

60.     Greystar maintains property-specific websites for Greystar Managed Properties. In some circumstances, Greystar does not manage the website but is still responsible for populating accurate unit availability and pricing information on the sites. Websites for Greystar Managed Properties, which usually bear the Greystar logo, ostensibly serve as places where prospective tenants can review information about each property – including amenities, pricing information, and unit availability – and access an application portal to apply for a rental unit. Each of these pages misrepresents the rental price and has omitted Hidden Fees to prospective tenants.

61.     A Greystar Managed Property's website generally displays details about the various features of both the apartment complex and the individual units on an "Amenities" webpage. Greystar usually discloses that prospective tenants will incur additional fees for certain optional "Amenities." For example, if a complex is pet friendly or has optional parking garages, the "Amenities" page often details the additional optional monthly cost of pet rent or assigned parking spaces.

62.     In contrast, Greystar touts certain "luxury" features in its Amenities section without flagging that these property features come at an additional, but mandatory, cost.  For example, when Greystar advertises on the "Amenities" webpage that a community offers "Valet Trash" or that a unit comes with "Dwelo Smart Home Technology," Greystar does *not* notify tenants that they must pay extra monthly fees for these services on top of the advertised rent price and cannot opt out of the service.

63.     Websites for Greystar Managed Properties typically also include a "Floor Plans" webpage, which displays the different unit floor plans and unit availability.  On the "Floor Plans" webpage, Greystar will typically list all *optional* fees associated with a unit, such as parking, storage, or pet fees, but again does not adequately identify any of the Hidden Fees that a tenant will be *required* to pay on top of the advertised rent price.

64.     The "Floor Plans" pages for Greystar Managed Property websites have changed multiple times since 2019, but all versions have failed to include all mandatory fees in the advertised monthly lease price.

65.     At various times since at least August 2019, Greystar has included a statement on the main "Floor Plans" page, or on a specific unit floor plan webpage, that: "Additional fees may apply, such as but not limited to package delivery, trash, water, amenities, etc."  Beginning in approximately mid-2024, after learning of the law enforcement investigation, Greystar began noting on the "Floor Plans" page that the advertised price is "Base Rent, [and] does not include non-optional fees and utilities."  Where Greystar has displayed this vague and conditional language on its property websites, it has done so regardless of which Hidden Fees Greystar

*actually* charges at the property, all of which are known to Greystar at the time a unit is listed for rent.

66.     Starting no earlier than mid-November 2024, Greystar began including a "Fee Guide" above or below the available unit floor plans on the "Floor Plans" page.  This "Fee Guide" includes a laundry list of required ("Essentials"), optional ("Personalized Add-Ons"), and contingent ("Situational") fees, and describes the fees as "a list of potential fees you might encounter as a current or future resident."  Greystar instructs the prospective tenant to "add your base rent to the Essentials and any Personalized Add-Ons you will be selecting."

67.     On these webpages, Greystar still misrepresents the total monthly leasing price and fails to include the aggregated amount of mandatory fees a prospective tenant would be required to pay each month or at move-in to rent a unit.  Instead, Greystar instructs the prospective tenant to parse through the various rental price representations and the long fee list to calculate it for themselves.

68.     From the "Floor Plans" webpage, a prospective tenant can click a link to enter the online application portal for the property if they would like to complete a rental application.  A prospective tenant's experience in the application portal is described further below, *infra* Section C.

c.   Greystar.com Listings

69.     Greystar also provides basic information about each Greystar Managed Property on its general website, Greystar.com.  The property-specific webpage on Greystar.com includes a brief blurb about the property, a list of amenities, available floorplans, and a rental price range.

From this site, prospective tenants can click links to visit individual property websites, enter the application portal, or send a message to the community.

70.     The rental price advertised on the Greystar.com page does not include any of the Hidden Fees that will be charged, even though the additional charges are fixed and known to Greystar.

71.      Beginning in approximately early 2024, after learning of the law enforcement investigation, Greystar made some changes to Greystar.com property pages, but still fails to state the true total cost of leasing a given rental unit.  Instead, Greystar added a statement that reads: "Base Rent shown.  Additional non-optional fees not included.  Contact community for more details."  As of late 2024, Greystar.com pages now also include the embedded Fee Guide described above.

72.     If a prospective tenant then clicks a link to visit the property-specific website, however, they will still see the same misrepresentations about the total cost of renting a unit. The lack of accurate information about pricing in the lead up to and during the application process is likely to mislead prospective tenants into believing that Greystar will charge them only the stated rent price for the rental unit.

### C.  Greystar Continues to Mislead Prospective Tenants During the Application Process

73.     After Greystar baits prospective tenants with deceptively low rental prices, Greystar guides them from the property website to an online application portal.  Prospective tenants must create a profile to log in, fill out an application form requiring copious personal information, and submit financial information.  If Greystar provides any information about Hidden Fees during this application process, it is piecemeal and unclear, especially given

Greystar's previous misrepresentations regarding the rental price. For example, Greystar may list some required fees but not others, or it may display certain fees only if a prospective tenant clicks a hyperlink. Even where Greystar embeds its Fee Guide on the application portal webpage, the same page may separately still incorrectly imply that the listed price includes all mandatory fees. In those instances, it is unclear whether the fees shown in the Fee Guide actually apply to the prospective tenant's desired unit.

74.    At the end of the application process, Greystar requires prospective tenants to provide their credit card, debit card, or bank account information to pay various fees in order to complete and submit an application, such as an application fee, an administrative fee, and/or a holding deposit. These fees may collectively amount to hundreds of dollars at some properties.

75.    As property manager, Greystar accepts rental applications from prospective tenants and enters into lease agreements on behalf of the owners of Greystar Managed Properties. Greystar encourages all interested prospective tenants to submit online applications to apply for available units.

76.    The application process is substantially similar across Greystar Managed Properties. In general, once a prospective tenant enters an application portal, the steps toward submitting a rental application are:

　　　　a.    The application portal website shows the prospective tenant the rental price, exclusive of Hidden Fees, which may vary based on the lease length, and the prospective tenant can select their desired lease term.

　　　　b.    The website shows an overview webpage that displays some information about the rental unit, such as deposit amount, unit number, square footage,

24

and occupancy. The website *may*, at this stage, show *some* mandatory fees, or include the Fee Guide, but generally does not aggregate the rent and mandatory fees into a total monthly leasing price.

c.      The website prompts the prospective tenant to create a profile in order to proceed with their application. The prospective tenant must input their name, email address, and phone number, and choose a username and password.

d.      The website may display additional information about the unit, including optional add-ons that the prospective tenant can select (e.g., parking spaces or pets in the unit).

e.      The prospective tenant fills out the application form, which requires providing extensive personal information.

f.      The website prompts the prospective tenant to pay fees by providing financial information in order to complete and submit their application. This may include a nonrefundable application fee, nonrefundable administrative fee, and a holding fee that is returned to the prospective tenant only in very limited situations. Depending on the property, collectively these fees can amount to hundreds of dollars. Greystar requires the prospective tenant to pay these fees using either a credit card, debit card, or bank account.

g.      The prospective tenant submits their application.

h.      If approved, Greystar sends the prospective tenant a lease to sign and may require additional payments/deposits.

77.      In order to complete the application process, prospective tenants must agree to Greystar's "application agreement."  Pursuant to the agreement, if the prospective tenant attempts to withdraw their application after it has been approved, Greystar will not refund their application and administrative fees, and can choose to retain their holding deposit as liquidated damages.

**i.      In Many Instances, Greystar Continued to Mislead Prospective Tenants Until After They Paid to Submit an Application in the Application Portal**

78.      In many instances between at least August 2019 and November 2024, Greystar has quoted only the deceptive advertised rental price throughout the application process, providing no information about Hidden Fees or the true total monthly leasing cost until after prospective tenants submitted their applications, paid the required fees and deposits, and finally received a copy of the lease.

79.      For example, as described below, Greystar has engaged in a bait-and-switch on the property website and ILS listings for the Broadstone on 9th property in Denver, Colorado, by initially promoting a low rent figure that excluded several Hidden Fees.

80.      In August 2023, after a prospective tenant created an account and continued into the full application portal for a unit in the Broadstone on 9th property, Greystar provided a price quote, which listed the prospective tenant's "Total Monthly Charges," and omitted any Hidden Fees.  *See* Fig. D below.



**Fig. D: Screenshot of Broadstone on 9th application portal (Aug. 2023)**

81.     Generally, to proceed with the application, Greystar requires the prospective tenant to provide their credit card, debit card, or bank account number and pay associated costs (an application fee and a holding fee).  Only after Greystar receives the payment and approves the prospective tenant's application does Greystar send the unit lease, wherein Greystar provides information about numerous Hidden Fees, often for the very first time, buried inconspicuously in the contract.

82. In the case of the Broadstone on 9th property, the first page of Greystar's lease described the "rent and charges" a tenant must pay, and excluded the Hidden Fees (*see* Figure E below).



**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ __1836.00__ per month for rent, payable in advance and without demand:

☒ at the on-site manager's office, or
☒ at our online payment site, or
☐ at _____
_____
_____.
or at any such other place we may designate in writing.

**Fig. E: Excerpt from Broadstone on 9th Master Lease Agreement (Aug. 2021)**

83. Only if the prospective tenant read through more than a dozen pages of the lease might the prospective tenant discover that a "Utility and Services Addendum" listed additional fees not included in the more prominent price information in the lease. The "Utility and Services Addendum" stated that tenants must pay several service fees: an additional $25 for valet trash service, $5 for pest control, and $5.40 for a "monthly administrative billing fee" every month (*see* Figure F below). The Addendum also required prospective tenants to pay additional fees related to utilities: a one-time $20 "New Account" fee and another $20 "Final Bill" fee (*see* Figure G below).



j) **Pest Control** service to your apartment will be paid by you either:
   ☐ directly to the utility service provider; or
   ☒ pest control bills will be billed by the service provider to us and then allocated to you based on the following formula: __4__
      ☒ If flat rate is selected, the current flat rate is $_____5.00_____ per month.
      ☒ 3rd party billing company if applicable __Conserve__
k) **Valet Trash** service to your apartment and costs will be paid by you either:
   ☐ directly to the utility service provider; or
   ☒ bills will be billed by the service provider to us and then charged to you based on the following formula: __4__
      ☒ If flat rate is selected, the current flat rate is $_____25.00_____ per month.
      ☒ Additional, replacement, and missing valet trash containers are $_____50.00_____.
      ☒ 3rd party billing company if applicable __Billed in house__

**Fig. F: Excerpt from Broadstone on 9th Utility and Services Addendum (Aug. 2021)**

3. When billed by us directly or through our billing company, you must pay utility bills within ___21___ days of the date when the utility bill is issued at the place indicated on your bill, or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are any new account, monthly administrative, late or final bill fees, you shall pay such fees as indicated below.

| | | | |
|---|---|---|---|
| New Account Fee: | $ ___20.00___ | (not to exceed $ ___25.00___ ) |
| Monthly Administrative Billing Fee: | $ ___5.40___ | (not to exceed $ ___6.00___ ) |
| Late Fee: | $ _____ | (not to exceed $ _____ ) |
| Final Bill Fee: | $ ___20.00___ | (not to exceed $ ___25.00___ ) |

If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

**Fig. G: Excerpt from Broadstone on 9th Utility and Services Addendum (Aug. 2021)**

84.    Broadstone on 9th tenants also must pay a one-time $20 package locker set-up fee.  *See* Fig. H below (from the same August 2021 lease).  Greystar did not provide prospective tenants with information about any of these one-time fees prior to sending the lease documents. Broadstone on 9th tenants were thus obligated to pay $484.80 in undisclosed monthly and one-time fees over the course of a one-year lease.

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2) **PACKAGE LOCKER:** This property offers the package locker amenity which shall be used for delivery of resident packages only. Resident will pay a one-time set-up fee of $20.00 for package locker, which is the amount charged by the service provider and/or administrative and account costs, which Owner may have to expend in the set-up of the service.

**Fig. H: Excerpt from Broadstone on 9th Master Lease Agreement (Aug. 2021)**

85.    These deceptive practices carried through to Greystar's own properties as well. For example, at the Greystar-owned and -managed Neptune Marina complex in Marina Del Rey, California, in August 2023, Greystar advertised one-bedroom apartments for rent beginning at $4,553 per month.  Greystar continued to make this representation in the price quote, as shown in Figure I below, and throughout the application.

//



**Fig. I: Screenshot of Neptune Marina application portal (Aug. 2023)**

86.     As of August 2023, after the prospective tenant paid their application fees and their application was approved, Greystar provided a lease wherein Greystar shared, for the first time, that the prospective tenant would have to pay the following monthly fees: $35 for valet trash service (*see* Figure J below), $2 for pest control, $4.75 for a "monthly administrative billing fee" (*see* Figure K below), and $3.61 for a Los Angeles-specific code enforcement fee (*see* Figure K below), costing the tenant $544.32 over the course of a one-year lease.



**Fig. J: Excerpt from Neptune Marina Utility and Services Addendum (Sep. 2021)**

> 12. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract.
>
> Residents are responsible for a monthly Pest Control Fee of $2.00 that will be reflected on the monthly statements. Residents will be responsible for a monthly $3.61 SCEP fee calculated based on the total expense billed to the community as divided equally to all units. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract. Formula 10: Sewer amounts are calculated based on the total expense billed to the community by the service provider, as divided equally to all units. Gas Hot Water Energy costs include common area usage. The monthly admin billing fee is billed at the lessor of $4.75 or 25% of the billed consumption charges.

**Fig. K: Excerpt from Neptune Marina Utility and Services Addendum (Sep. 2021)**

ii.    **In Many Instances, Greystar Continued to Mislead Prospective Tenants Until After They Had Disclosed Their Personal Information Within the Application Portal**

87.    In many instances since August 2019, Greystar has shared information about *some* Hidden Fees only after a prospective tenant has created an account in the application portal by providing personal information.

88.    For example, in July 2023, at the Greystar-owned and -managed Avia Lowry complex in Denver, Colorado, Greystar offered a two-bedroom apartment "starting from $2,535 per month," as seen in Figure L below.  Greystar promoted this rate in the ILS listing for the property and on the individual property website.

//



**Fig. L: Screenshot of Avia Lowry website (July 2023)**

89.    Greystar directed interested prospective tenants to the application portal, where the prospective tenant had to provide their personal information and create an account to proceed.

90.    At this point in the process, Greystar listed additional fees for the first time, as well as a new total rent figure, on the right-hand side of the webpage.  These monthly fees – $25 for valet trash service, $2 for pest control, and $17 for package valet service – added $44 per month to the quoted rent rate.  Greystar's promised $2,535 rent thus increased to $2,579 per month, as shown in Figure M below.

//



**Fig. M: Screenshot of Avia Lowry application portal (July 2023)**

91.      Even while informing prospective tenants of some Hidden Fees at this stage, Greystar still omitted a $3 Renewable Energy Fee and a $4.65 utility administration fee that would be charged every month, as shown in excerpts from a lease in Figures N and O below.  In total, an Avia Lowry tenant thus had to pay an additional $619.80 more than the advertised rent price during the course of a one-year lease.  In any event, a prospective tenant *could not* rent the unit for Greystar's advertised rate of $2,535.

> j)  **Pest Control** service to your apartment will be paid by you either:
> ☐ directly to the utility service provider; or
> ☒ pest control bills will be billed by the service provider to us and then allocated to you based on the following formula:  __4__
> ☒ If flat rate is selected, the current flat rate is $_____2.00_____ per month.
> ☐ 3rd party billing company if applicable
>
> k)  **Valet Trash** service to your apartment and costs will be paid by you either:
> ☐ directly to the utility service provider; or
> ☐ bills will be billed by the service provider to us and then charged to you based on the following formula: _____
> ☐ If flat rate is selected, the current flat rate is $_____ per month.
> ☐ Additional, replacement, and missing valet trash containers are $_____.
> ☐ 3rd party billing company if applicable
>
> l)  (Other) **Renewable Energy Fee** _____ service to your apartment will be paid by you either:
> ☐ directly to the utility service provider; or
> ☒ bills will be billed by the service provider to us and then allocated to you based on the following formula:  __4__
> ☐ If flat rate is selected, the current flat rate is $_____3.00_____ per month.
> ☐ 3rd party billing company if applicable  **Conservice**

**Fig. N: Excerpt from Avia Lowry Utility and Services Addendum (Aug. 2021)**



**Fig. O: Excerpt from Avia Lowry Utility and Services Addendum (Aug. 2021)**

### iii.    Fee Information that Is Provided Is Often Incomplete, Confusing, or Hidden Behind Hyperlinks

92.    For a subset of properties, Greystar does provide limited information about its Hidden Fees after a prospective tenant reaches the application portal, but before Greystar requires them to create an account.  This includes webpages where Greystar now embeds the Fee Guide.  In these situations, Greystar has already repeatedly misrepresented the monthly price to entice a prospective tenant this far into the process.

93.    At times, Greystar has concealed information about these Hidden Fees behind multiple links and deceptive rent claims.  For example, in May 2024, at the Hamilton Crossing apartment complex in Riverton, Utah, in May 2024, Greystar advertised a three-bedroom unit for rent "starting at" $2,300 per month.  This figure appeared on the ILS listings, as well as on the individual property website.  In the application portal, the monthly cost increased to $2,302, due to a newly added $2 pest control charge, as shown in Figure P below.

//



**Fig. P: Screenshot of Hamilton Crossing application portal (May 2024)**

94.     In the figure above, "Rent" and "Pest Control Rebill" charges were the only itemized items on the left-hand side of the webpage.  Yet, if a prospective tenant clicked the small-print "view details" link under the bold and large-print monthly total, the website suddenly listed an additional $110 per month for a mandatory "Media Package" fee, as shown in Figure Q below.  Thus, this prospective tenant's monthly rent totaled $2,412, rather than the $2,300 advertised by Greystar.  Greystar also still failed to list the required monthly utility administration fees, even in the "view details" link with the other Hidden Fees.

//



**Fig. Q: Screenshot of Hamilton Crossing application portal (May 2024)**

95.    Greystar did not provide information about these Hidden Fees or disclose the actual rental cost at any other point during the application process. If the prospective tenant did not see and click the obscure "view details" link, they would pay the nonrefundable application fee and the holding deposit before learning the true cost of the apartment unit.

96.    Even after Greystar started including the Fee Guide on some property websites, the presentation of pricing information remains confusing and contradictory. For example, the Hamilton Crossing application portal still lists "Pest Control Rebill" as the only itemized fee, even though the associated Fee Guide identifies both Media Package fees and utility administration fees. On the other hand, in the application portal under the "view details" link, the Media Package fee is listed, but not the utility administration fee.

**iv.    Greystar Charges Tenants to Apply for and Reserve Deceptively Priced Units**

97.    Application fees for units at Greystar Managed Properties range from $10 to over $100, depending on the state. Application fees are not refundable, even though prospective

tenants pay these fees before they have an opportunity to review the complete lease terms and full range of fees associated with the rental unit.

98.    In addition, Greystar often charges tenants several hundred dollars in holding deposits, which are applied to the prospective tenant's security deposit or first month's rent if the prospective tenant signs a lease.  Holding deposits are refundable only if Greystar denies a prospective tenant's rental application or if a prospective tenant withdraws their application within a limited amount of time after submitting their application (generally only 36 to 48 hours). If a prospective tenant withdraws their application after approval, or after the short time period expires, Greystar retains the prospective tenant's holding deposit as liquidated damages.

99.    At some Greystar Managed Properties, Greystar will also require applicants to pay a nonrefundable administrative fee at the time of applying, which can cost between $100 and $300.  This fee may be in lieu of, or in addition to, a holding deposit.

100.    Greystar requires prospective tenants submitting applications online to provide financial information to pay their application fees and other charges using a debit card, credit card, or bank account.  Because of Greystar's Hidden Fees and misrepresentation of the total cost of renting a unit, prospective tenants pay to apply for rental units under false pretenses.

101.    Once a prospective tenant submits an application and pays all mandated fees, and Greystar approves the application, Greystar finally sends the prospective tenant a lease agreement to review and sign electronically.  As described in Sections C(i) and (ii), the lease agreement has often been the first place that Greystar has disclosed all Hidden Fees.  Yet even in the lease agreement, Greystar represents the "rent and charges" as one price on the first page, and then buries Hidden Fees in addenda more than a dozen pages deep into a dense and lengthy

document.  After a tenant signs a lease for a unit at a Greystar Managed Property, they face huge financial penalties for breaking the lease early, even if Greystar misled the tenant about the price of the unit.

### D.  Greystar Knows or Should Know that It Is Misleading Prospective Tenants About the Most Important Factor in Choosing an Apartment

102.    Greystar is aware that pricing is the top consideration for most prospective tenants when choosing a rental unit.  Greystar also knows, through many complaints from tenants and prospective tenants, that it is misrepresenting the price of rental units and deceiving consumers about the true cost of renting a unit at a Greystar Managed Property.

103.    Greystar tracks tenant and prospective tenant communications and complaints through various channels.  This includes communications sent directly through property websites, resident portals, or Greystar.com; reviews or comments posted on social media channels; and input solicited through a survey program.

104.    Tenants and prospective tenants have frequently complained to Greystar through these channels about unexpected charges on their monthly statement or on the lease provided to them after application.  The message to Greystar has been clear: Greystar is misrepresenting the price of renting a unit by omitting various Hidden Fees.  For example, several Greystar tenants complained of Hidden Fees after they had been living in their units:

      a.     "Never once was I told about the additional costs on top of my rent that were to be paid monthly until after I had signed my lease and paid my deposit. …You also have to pay for valet trash (even if you are fine taking out your own trash) You have to pay for Direct TV (which I never use) you have to pay for your own utilities AND the amenity utilities.  You

also pay for pest control, sewer, etc. Which does nothing because there are bugs everywhere....When signing my lease I was quoted just over $1,000 not bad right?  well with all their additional things that are required for you to pay I pay about $1,400 NOT INCLUDING UTILITIES.  I have no need to sit down to 'review' my billing with you [property name], I fully understand your hidden fees and how you hook in people trying to rent an apartment.  [It's] dirty and not right but when you need a place to stay you gotta do what you gotta do right?"  (A tenant in Sandy, Utah, in August 2020)

b.    "THE BAD: 1. Fees!  My 1BR apartment is already really expensive even after accounting for the 2 months I got free for signing a 16 month lease. In addition to rent, there is a mandatory $25/month for trash pickup, ~$100 for common area utility sharing, $25/month per parking spot (no issues with this), and additional sewer, trash, and pest control fees.  The structure seems to be designed to prevent the total cost from being discovered when you sign your lease."  (A tenant in Boulder, Colorado, in December 2021)

c.    "My biggest complaints are the lack of sufficient parking for guests and the exorbitant fees and hidden charges applied to every bill beyond the advertised rent.  These fees should be included in the cost of rent instead of enticing residents to move in with low payments then adding ~$400 to

every bill between parking space costs and community electric bills and fees." (A tenant in Boulder, Colorado, in April 2022)

d.      "Upon signing up I was continuously lied to, I was told my rent total would amount to 1,150. Not bad for a beautiful apartment with tons of amenities right? JUST WAIT, they stack on every charge month after month they can think of, and no there is no opting out. Do not believe their lies. By month number 2 I was paying more than 1400$ for a 1 bed 1 bath apartment and everytime I tried to confront them about anything, 'it was in your contract'. If [name] tells you that the utilities are included, I absolutely assure you they are not! You will have an extra 100 a month for you own utilities and near that much for 'common area utilities.'" (A tenant in Orem, Utah, in July 2021)

e.      "The advertised price and the actual price from tacked on fees is about a $350/mo difference. Don't apply here if you're not willing to pay more than the advertised price in useless 'media package'-type BS." (A tenant in Salt Lake City, Utah, in May 2020)

f.      "For starters they advertise 1400 a month for a 2 bed what they [don't] tell you is that there is about 200 extra in fees making it more like 1600." (A tenant in Westminster, Colorado, in July 2020)

g.      "The story of my residence in a completely new building began with the failure to fulfill promises and withholding hidden fees that were not previously announced. Be careful and immediately add at least [$]200-400

to the monthly amount and bills that you usually pay." (A tenant in

Walnut Creek, California in March 2020)

105.    Some prospective tenants learned of Hidden Fees only after reviewing their lease

agreement and then complained to Greystar that they had misrepresented the price. These

prospective tenants chose not to sign the rental agreement, but at least some of them lost money

in the process. For example:

a.    "Don't [m]ove here. Hidden fees in lease. They get no stars from me.
Ended up backing out and not signing. Lost $360 in deposits and
application fees. Better [than] paying $1650 in rent for a 642 sq ft
apartment for a year!" (A prospective tenant in Henderson, Nevada, in
June 2021)

b.    "This isn't really a customer service concern, more of a predatory leasing
policy concern. The $25/mo mandatory trash valet and $140/mo
mandatory cable charges are not disclosed ANYWHERE on the website
when looking at the monthly charges. They are also omitted when you
specifically ask the front office over the phone what the monthly charges
are in addition to the rent. They are also not even listed on the list of
optional monthly charges (such as parking spots, pets, etc.). They are only
added after you pay the application fees and are approved for the unit.
[Name] in the front office offered no apologies when I called and told him
these charges were not disclosed and basically said 'oh okay' when I said I
would not be proceeding with the application. This is done on purpose to

lure people in, then spring these charges on them last minute, with the idea being that many people are likely looking to move last minute and will bite the bullet on the extra monthly charges."  (A prospective tenant in Salt Lake City, Utah, in February 2022)

106.    Greystar instructs its employees to respond to fee-related tenant complaints posted online with canned responses and to emphasize that they "follow the lease contract when assessing fees and/or charges."  Greystar does not appear to deviate from this approach, even when tenants complain that they were never informed about a fee in the advertising or application process.

107.    Greystar also contracts with Reputation.com to monitor online sentiment about Greystar and Greystar's Managed Properties.  Greystar receives the annual Reputation.com Property Management Reports, which aggregate and analyze online sentiment across the rental housing industry.

108.    Greystar was aware that, in 2021, Reputation.com warned property managers that "surcharges" were one of the top drivers of negative sentiment in renters.  The company further noted that "[c]omplaints about surcharges often related to deposit money being withheld or surprises such as fees for trash removal."

109.    Greystar knows that rent is the ***most important factor*** for most renters when choosing a new apartment.  The same 2021 Reputation.com report emphasized that "77% of renters say that rent is the most important factor when they search for an apartment."

110.    Greystar nonetheless continues to mislead prospective tenants about the true cost of renting a unit at a Greystar Managed Property, thereby inhibiting their ability to accurately comparison shop between different apartment complexes and property managers.

**E.  Greystar Uses Its Misrepresentations to Entice Consumers to Hand Over Their Financial Information**

111.    Greystar uses the misrepresentations set forth above to obtain or attempt to obtain, or to cause to be disclosed or attempt to cause to be disclosed, consumers' sensitive personal and financial information.

112.    To apply for and rent a unit at a Greystar Managed Property, consumers must provide financial information such as bank account, credit card, or debit card information to complete a rental application and pay required application or holding fees, move-in funds, or security deposits.  When consumers apply and rent a unit at a Greystar Managed Property, Greystar obtains consumers' financial information or causes consumers' financial information to be disclosed to its payment processors or other third parties.  Consumers cannot rent a unit without completing a rental application and paying the required application or holding fees.

113.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

**F.  Greystar Operates and Holds Itself Out as a Fully Integrated Business**

114.    While Greystar maintains a complicated web of corporate entities on paper, it operates and holds itself out to the world as one unified business.  Greystar markets itself as a provider of "fully integrated real estate services" with a "vertically-integrated business model." In selling itself to clients, Greystar promotes its cohesive operations.  On Greystar.com, the

company touts the "Greystar Advantage," which includes "[s]ystems, technologies and toolkits to ensure consistency in how we operate our properties and serve our residents."

115.    Many of Greystar's functions are common across its operations.  For example, Greystar utilizes consolidated enterprise services to provide support across all of Greystar's lines of business in the United States, including for human resources, corporate technology services, risk management, and corporate accounting and tax; maintains a dedicated Support Services team to provide client services, marketing, finance, technology, and business systems for its property management functions; employs common internal operating policies and procedures for its property management functions; has executives who simultaneously serve in roles with GREP LLC, GREP General Partner, GS Management Services, and RS National; uses common registered business addresses for each of the Defendants; and enters into contracts that apply across the organization.

116.    Greystar's primary corporate website, Greystar.com, also presents the company as a single entity.  For example, on the Greystar.com website, Greystar touts that it has a "presence in 161 markets in the US, supported by 49 offices" and highlights its "Regional Offices" throughout the country; advertises all the properties it manages; lists job postings for a wide range of positions across Greystar's corporate landscape; issues press releases boasting of Greystar's activities, generally without specifying the corporate entity directly responsible; defines Greystar Real Estate Partners, LLC as "Greystar" in the website "Terms of Use"; and advises that its privacy policy applies to information Greystar receives in a wide range of situations, including "[t]hrough the Greystar websites operated by Greystar and its affiliates."

117.    Greystar's website specifically identifies many of its regional subsidiaries, including Defendants GREP Southwest and Greystar California, as doing business as "Greystar."

118.    The property-specific websites that Greystar manages for each property, regardless of which specific subsidiary is contracted for property management, are branded with the "Greystar" logo.  Clicking on the logo takes the user to Greystar.com.  Likewise, clicking on the "Privacy Policy" link at the bottom of the website also directs the user to Greystar's Global Privacy Policy webpage on Greystar.com.

119.    Tenants and prospective tenants may also be unable to identify which Greystar entity they are dealing with.  The email domain Greystar generally uses for contact emails for the properties it manages is "@greystar.com," regardless of the specific Greystar corporate entity contracted to manage the property.  Finally, lease agreements at many of Greystar's managed properties refer the tenant to www.greystar.com/privacy for information about the applicable privacy policy.

## VIOLATIONS OF THE FTC ACT

120.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

121.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

**Misrepresentation of the Total Cost of Renting a Unit at a Greystar Managed Property**

122.    In numerous instances in connection with the advertising, marketing, promotion, or offering for lease of rental apartments, Defendants represent, directly or indirectly, expressly

or by implication, that the advertised monthly leasing price is the total monthly amount that consumers will pay to rent a unit in a Greystar Managed Property.

123.    In fact, in numerous instances in which Defendants have made the representation described in Paragraph 122, the advertised monthly leasing price is not the total monthly amount that consumers will pay to rent a unit in a Greystar Managed Property, because the advertised price does not include all mandatory monthly fees that consumers must pay.

124.    Therefore, Defendants' representation as described in Paragraph 122 is false and misleading and constitutes a deceptive act or practice in violation of Sections 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

125.    Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect.  Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain, or caus[ing] to be disclosed or attempt[ing] to cause to be disclosed to any person, customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

126.    The GLB Act defines "customer" to mean, "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary."  15 U.S.C. § 6827(1).  The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer."  15 U.S.C.

§ 6827(2).  The GLB Act defines a "financial institution" as "any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution."  15 U.S.C. § 6827(4)(A).  A "financial institution" includes "any credit card issuer or operator of a credit card system, and any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis."  15 U.S.C. § 6827(4)(B).

127.    Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."  Pursuant to Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act.  Section 814(a) of the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance by any person with the FDCPA, including the powers to the enforce provisions of the FDCPA in the same manner as if the violation had been a violation of an FTC trade regulation rule.  Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the GLB Act, including but not limited to the rescission or reformation of contracts, and the refund of money or return of property.

**COUNT II**

**Use of False, Fictitious, or Fraudulent Statements to Obtain, Attempt to Obtain, Cause to Be Disclosed, or Attempt to Cause to Be Disclosed Customer Information of a Financial Institution**

128.    In numerous instances in connection with the advertising, marketing, promotion, or offering for lease of rental apartments, Defendants have made false, fictitious, or fraudulent statements or representations to customers of financial institutions to obtain or attempt to obtain, or to cause to be disclosed or attempt to cause to be disclosed, customer information of a financial institution as part of the rental application process.  The customer information of a financial institution that Defendants obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed, includes consumers' bank account, credit card, and debit card numbers.

129.    In numerous instances, Defendants have obtained or attempted to obtain, or have caused to be disclosed or attempted to cause to be disclosed, the customer information of a financial institution as part of the rental application process by representing, directly or indirectly, expressly or by implication, that consumers could rent units in Greystar Managed Properties for the advertised monthly leasing price.

130.    Defendants' representations set forth in Paragraph 128 above were false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

131.    Therefore, Defendants' acts and practices set forth in Paragraphs 128 to 129 above violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**

132.    The CCPA prohibits unfair or deceptive trade practices.  Col. Rev. Stat. § 6-1-105.  The Attorney General is authorized to enforce the CCPA under Colo. Rev. Stat. §6-1-103.

**COUNT III**

**Making False or Misleading Statements of Fact Concerning the Cost of Renting a Unit at a Greystar Managed Property**

133.    In numerous instances in connection with the advertising, marketing, promotion, or offering for lease of rental apartments, Defendants represent, directly or indirectly, expressly or by implication, that the advertised monthly leasing price is the total monthly amount that consumers will pay to rent a unit in a Greystar Managed Property.

134.    In fact, in numerous instances in which Defendants have made the above representation, the advertised monthly leasing price is not the total monthly amount that consumers will pay to rent a unit in a Greystar Managed Property, because the advertised price does not include all mandatory monthly fees that consumers must pay.

135.    This representation is false or misleading and is thus a violation of the CCPA, Colo. Rev. Stat. § 6-1-105(1)(l).

**COUNT IV**

**Engaging in an Unfair, Unconscionable, or Deceptive Practice**

136.    In numerous instances in connection with the advertising, marketing, promotion, or offering for lease of rental apartments, Defendants represent, directly or indirectly, expressly or by implication, that the advertised monthly leasing price is the total monthly amount that consumers will pay to rent a unit in a Greystar Managed Property.

137.    In fact, in numerous instances in which Defendants have made the above representation, the advertised monthly leasing price is not the total monthly amount that consumers will pay to rent a unit in a Greystar Managed Property, because the advertised price does not include all mandatory monthly fees that consumers must pay.

138.    Defendants' business practice of misrepresenting the monthly rent is unfair, unconscionable, and deceptive and violates the CCPA, Colo. Rev. Stat. § 6-1-105(1)(rrr).

## CONSUMER INJURY

139.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the GLB Act, and the CCPA.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the GLB Act, and the CCPA.

B.    Award monetary and other relief within the Court's power to grant.

C.    Pursuant to Colo. Rev. Stat. § 6-1-112(1)(a), award the State of Colorado civil penalties of up to $20,000 per violation of the CCPA.

D.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  January 16, 2025                    /s/ *Samantha Bennett*
                                            SAMANTHA BENNETT
                                            NY Bar No. 5132063
                                            ROBERTA DIANE TONELLI
                                            Cal. Bar No. 278738
                                            SPENCER SCOVILLE
                                            D.C. Bar No. 1766898
                                            Federal Trade Commission
                                            Western Region San Francisco
                                            90 7th Street, Suite 14-300
                                            San Francisco, CA 94103
                                            Tel: (415) 848-5100
                                            Email: sbennett@ftc.gov; rtonelli@ftc.gov;
                                            sscoville@ftc.gov

                                            Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION


Dated:  January 16, 2025                    PHILIP J. WEISER
                                            Attorney General


                                            /s/ *Adam T. Rice*
                                            JULIANNE B. CRAMER, 57111
                                            First Assistant Attorney General
                                            ADAM T. RICE, 53963
                                            Assistant Attorney General
                                            Civil Rights Unit, Housing Protection
                                            Consumer Protection Section
                                            1300 Broadway, 9th Floor
                                            Denver, CO 80203
                                            Tel: (720) 508-6000
                                            Email: Julie.Cramer@coag.gov;
                                            Adam.Rice@coag.gov

                                            Attorneys for Plaintiff
                                            STATE OF COLORADO