**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

FEDERAL TRADE COMMISSION, et al.,

       *Plaintiffs,*

    v.

GREYSTAR REAL ESTATE PARTNERS, LLC, et al.,

       *Defendants.*

Case No. 1:25-cv-00165

**DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.     Statutory and Regulatory Background .................................................... 2

     A.     The FTC Act ................................................................................ 2

     B.     The Gramm-Leach-Bliley Act ..................................................... 3

     C.     The Fees Rule ............................................................................ 5

     D.     The Colorado Consumer Protection Act ..................................... 5

II.    Allegations in the Complaint .................................................................. 6

LEGAL STANDARD ............................................................................................. 8

ARGUMENT......................................................................................................... 9

I.     The FTC Fails to State a GLB Act Claim. ............................................... 9

     A.     The Plain Text of the GLB Act Shows It Does Not Apply
Here. ......................................................................................... 10

     B.     The GLB Act Did Not Fundamentally Alter the FTC's
Enforcement Authority. .............................................................. 16

     C.     The FTC's Own Conduct Confirms Its Novel Reading of the
GLB Act Is Wrong....................................................................... 18

II.    The FTC Does Not Plausibly Allege that Consumers Relied on the
Challenged Advertisements. ................................................................... 21

III.   Plaintiffs Do Not Plausibly Allege that the Challenged
Advertisements Are Deceptive. .............................................................. 22

IV.   The Complaint Fails to State a Claim Against Each Defendant. .......................... 25

V.    The Court Lacks Personal Jurisdiction Over All Defendants Except
for Greystar Management Services, LLC and GREP Southwest,
LLC. ....................................................................................................... 26

CONCLUSION ..................................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**

*Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) ................................................. 18

*AMG Capital Management, LLC v. FTC*, 593 U.S. 67 (2021) ................................... 1, 3, 20

*Benton v. Cameco Corp.*, 375 F.3d 1070 (10th Cir. 2004)............................................. 28

*Biden v. Nebraska*, 600 U.S. 477 (2023)...................................................................... 17, 18

*Carter Products v. FTC*, 186 F.2d 821 (7th Cir. 1951) ..................................................... 24

*Clinton v. Security Benefit Life Insurance Co.*, 63 F.4th 1264 (10th Cir. 2023)................................................................................................................................... 25

*Dubin v. United States*, 599 U.S. 110 (2023) ....................................................... 11, 13, 14

*Employees' Retirement System of Rhode Island v. Williams Cos.*, 889 F.3d 1153 (10th Cir. 2018) ................................................................................................. 8

*Ford v. Hotwire, Inc.*, 2008 WL 5874305 (S.D. Cal. Feb. 25, 2008) ............................... 23

*FTC v. BCO Consulting Services, Inc.*, 2023 WL 4291446 (C.D. Cal. May 22, 2023) ......................................................................................................................... 19

*FTC v. Celsius Network Inc.*, 2024 WL 1619360 (S.D.N.Y. Apr. 12, 2024) ................... 19

*FTC v. Celsius Network Inc.*, 2023 WL 8603064 (S.D.N.Y. Dec. 12, 2023) .................. 19

*FTC v. Doxo, Inc.*, 2024 WL 5119829 (W.D. Wash. Dec. 16, 2024) ........................ 18, 19

*FTC v. Financial Education Services*, 2024 WL 3663069 (E.D. Mich. Aug. 5, 2024)........................................................................................................................ 18

*FTC v. Financial Education Services*, 2023 WL 8101841 (E.D. Mich. Nov. 21, 2023)........................................................................................................................ 19

*FTC v. Freecom Communications, Inc.*, 401 F.3d 1192 (10th Cir. 2005)................. 22, 23

*FTC v. Noland*, 2021 WL 289659 (D. Ariz. Jan. 28, 2021)............................................. 26

*FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368 (S.D.N.Y. 2023) .............................. 19

*FTC v. Start Connecting LLC*, 2024 WL 3990084 (M.D. Fla. July 11, 2024) ................. 19

*GCIU-Employer Retirement Fund v. Coleridge Fine Arts*, 808 F. App'x 655
(10th Cir. 2020) ................................................................................9, 26, 27

*Harris v. Las Vegas Sands L.L.C.*, 2013 WL 5291142 (C.D. Cal. Aug. 16,
2013) ....................................................................................................... 23

*Loughrin v. United States*, 573 U.S. 351 (2014) ...................................12, 13, 14

*Murtagh v. Bed Bath & Beyond Inc.*, No. 19-cv-03487, 2020 WL 4195126
(D. Colo. July 3, 2020), *report and recommendation adopted*, 2020 WL
4193553 (D. Colo. July 21, 2020) ................................................................ 25

*New Mexico v. Department of Interior*, 854 F.3d 1207 (10th Cir. 2017) ................... 16, 17

*Peay v. BellSouth Medical Assistance Plan*, 205 F.3d 1206 (10th Cir.
000) ....................................................................................................9, 26, 27

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142
(Colo. 2003) ............................................................................................. 23

*Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008) .................................... 25

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) .................................. 17

*Simpson v. P.F. Chang's China Bistro, Inc.*, 2021 WL 8153748 (D. Colo.
Nov. 4, 2021) ............................................................................................ 25

*United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) ..................................... 14

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ......................... 17, 18

*Washington v. Hyatt Hotels Corp.*, 2020 WL 3058118 (N.D. Ill. June 9,
2020) ....................................................................................................... 23

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...................................................... 18

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ........................... 16

**STATUTES**

15 U.S.C. § 45 ................................................................................................ 8

15 U.S.C. § 45(a)(1) ...................................................................................2, 9

15 U.S.C. § 45(m)(1)(A) ................................................................................. 3

15 U.S.C. § 45(m)(1)(B) ............................................................................ 3

15 U.S.C. § 53(b)(2) ................................................................................. 2

15 U.S.C. § 57a(a)(1)(B) .......................................................................... 2

15 U.S.C. § 57b(a)(1) ............................................................................... 3

15 U.S.C. § 57b(a)(2) ............................................................................... 3

15 U.S.C. § 57b(b) ..............................................................................21, 22

15 U.S.C. § 6821 ...................................................................................... 3

15 U.S.C. § 6821(a) ...............................................................................4, 9

15 U.S.C. § 6821(a)(1) .........................................................................8, 11

15 U.S.C. § 6821(a)(2) .......................................................................10, 11

15 U.S.C. § 6821(a)(3) ............................................................................ 11

15 U.S.C. § 6822 ...................................................................................... 3

15 U.S.C. § 6823 ...................................................................................... 3

15 U.S.C. § 6824 ...................................................................................... 3

15 U.S.C. § 6825 ..............................................................................3, 4, 12

15 U.S.C. § 6826 ...................................................................................... 3

15 U.S.C. § 6827 ...................................................................................... 3

18 U.S.C. § 1028A(a)(1)............................................................................ 13

18 U.S.C. § 1344(2) ................................................................................. 12

Colo. Rev. Stat. § 6-1-105 ........................................................................ 8

Colo. Rev. Stat. § 6-1-105(1) .................................................................... 5

Colo. Rev. Stat. § 6-1-110(1) .................................................................... 6

Colo. Rev. Stat. § 6-1-112(1)(a).................................................................. 6

Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1446 (1999) ......................... 11

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 106-434 (1999) (Conf. Rep.), *as reprinted in* 1999
U.S.C.C.A.N. 245 ........................................................................................... 12

Prepared Statement of Rebecca Kelly Slaughter, FTC, *Testimony Before
the Subcomm. on Consumer Prot. and Com. of the H. Comm. on Energy
and Com.* (Apr. 27, 2021), https://www.ftc.gov/system/files/documents/
public_statements/1589400/p180500house13btestimony04272021.pdf .................. 20

**OTHER AUTHORITIES**

16 C.F.R. § 464.2(a) ........................................................................................... 5

*Base*, *Merriam-Webster Dictionary* (1986) ........................................................ 24

Board of Governors of Federal Reserve System, *Identity Theft & Pretext
Calling* (Apr. 26, 2001), https://www.federalreserve.gov/board
docs/srletters/2001/sr0111.htm .................................................................... 4, 12

Board of Governors of Federal Reserve System, *Federal Reserve
Payments Study: Cards and Alternative Payments* (rel. Nov. 2024),
https://www.federalreserve.gov/paymentsystems/fr-payments-study.
htm ....................................................................................................... 18

Comments of National Ass'n of Apartments & National Multifamily Housing
Council, Docket No. R207011 (FTC Feb. 7, 2024), https://www.naahq.
org/sites/default/files/2024-04/FTC-2023-0064-3133_attachment_2%
20%281%29.pdf?_gl=1*1h1u2fb*_gcl_au*MTYxMjYxNzA2OC4xNz
Q0MTMyNDIy*_ga*MzE0NjAwNTQ1LjE3MjYwMDI1Mzc.*_ga_70J0BC
ECMC*MTc0NDMxODI4Mi43LjAuMTc0NDMxODI4Mi42MC4wLjE3ND
E3OTI5MDI........................................................................................7, 8, 22

Complaint, *FTC v. Voyager Digital, LLC*, 1:23-cv-08960 (S.D.N.Y. Oct. 12,
2023), ECF No. 1 ............................................................................................ 19

Complaint, *FTC v. Xtel Marketing, Inc.*, No. 04 C 7238 (N.D. Ill. Nov. 9,
2004), 2004 WL 3523308 ........................................................................... 10, 19

2 Dan B. Dobbs, *Law of Remedies* § 9.2(6) (2d ed. 1993) ............................................. 21

FDIC, *Guidance on Identity Theft & Pretext Calling*, FIL-39-2001 att. (2001),
https://www.fdic.gov/news/financial-institution-letters/2001/fil0139a.
html (last updated Mar. 24, 2024) .......................................................4-5, 12

Fed. R. Civ. P. 8(a)(2) ........................................................................................... 25

Fed. R. Civ. P. 12(b)(2) ........................................................................................ 8

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 9

Samuel Levine, *State of the Bureau: A BCP Progress Report*, FTC Blog
(Jan. 16, 2025), https://web.archive.org/web/20250126182548/https://
www.ftc.gov/business-guidance/blog/2025/01/state-bureau-bcp-prog
ress-report ......................................................................................................... 20

Letter from Samuel Levine, FTC, to Governor Jared Polis (Jan. 15, 2025),
https://www.ftc.gov/system/files/ftc_gov/pdf/letter-of-sam-levine-to-gov
ernor-polis-re-junk-fees.pdf ............................................................................. 20

Press Release, FTC, *FTC Kicks off 'Operation Detect Pretext'* (Jan. 31,
2001), https://www.ftc.gov/news-events/news/press-releases/2001/01/
ftc-kicks-operation-detect-pretext ...................................................................... 4

Stipulated Order, *FTC v. Invitation Homes, Inc.*, No. 1:24-cv-04280 (N.D.
Ga. Sept. 27, 2024), ECF No. 21 ............................................................... 18-19

*Trade Regulation Rule on Unfair or Deceptive Fees*, 90 Fed. Reg. 2066
(FTC Jan. 10, 2025) (to be codified at 16 C.F.R. §§ 464.1–5) .............................. 5, 21

*Trade Regulation Rule on Unfair or Deceptive Fees, Notice of Proposed
Rulemaking*, 88 Fed. Reg. 77420 (FTC Nov. 9, 2023) .................................................. 5

Transcript of Oral Ruling on Motion to Dismiss, *FTC v. Voyager Digital, LLC*,
No. 1:23-cv-08960 (S.D.N.Y. May 22, 2024), ECF No. 74 ......................................... 19

U.S. Census Bureau, *Housing Inventory Estimate: Renter Occupied
Housing Units in the United States*, retrieved from FRED, Fed. Rsrv.
Bank of St. Louis (updated Feb. 5, 2025), https://fred.stlouisfed.org/
series/ERNTOCCUSQ176N ................................................................................ 18

Defendants hereby move to dismiss plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## INTRODUCTION

This case bears all the hallmarks of agency overreach: years of an agency relying on an overly broad view of its own authority, the Supreme Court limiting that authority, and now, the sudden discovery of new, far-reaching authority in a stray provision of a statute about something else entirely. This Court should rein in the Federal Trade Commission's ("FTC") latest attempts to outrun the Supreme Court and overstep its congressionally delineated authority.

In *AMG Capital Management LLC v. FTC*, 593 U.S. 67 (2021), the Supreme Court held that—contrary to decades of agency practice—the FTC may not seek monetary relief without a clear rule prohibiting the relevant conduct. There is no such rule here. The FTC recently proposed one but narrowed it in response to comments so that it *excludes* the rental housing industry.

The FTC chose to plow forward with this case anyway. And the "rule" it has unearthed to rely on for its monetary claim is completely unfit for the task. The Gramm-Leach-Bliley Act ("GLB Act") is not about housing or fees or even advertising, but financial fraud and identity theft. The FTC's reading of the GLB Act defies the plain text, statutory context, and caselaw. And it would dramatically expand the FTC's enforcement authority, turning the GLB Act into an all-purpose consumer protection statute and eviscerating Congress's intended enforcement scheme.

The misuse of the GLB Act is especially inappropriate here because the transactions described in the Complaint are neither deceptive nor unfair under either the Federal Trade Commission Act ("FTC Act") or under the Colorado Consumer Protection Act ("CCPA"). Moreover, the Complaint engages in impermissible group pleading, and this Court lacks personal jurisdiction over several defendants. For all these reasons, the Complaint should be dismissed.

## BACKGROUND

**I.    Statutory and Regulatory Background**

The FTC brings this case against one player in the rental housing sector—a sector it just declined to regulate via rulemaking—based on advertising practices that have long been standard across the industry. As set forth below, neither the statutory scheme nor any regulation authorizes the relief being sought.

**A.    The FTC Act**

Section 5 of the FTC Act declares it "unlawful" to engage in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1). The FTC is authorized to make "rules which define with specificity acts or practices which are unfair or deceptive acts or practices[.]" *Id.* § 57a(a)(1)(B).

The FTC may seek two types of relief in federal court. First, to stop a party that "is violating, or is about to violate" the FTC Act or "any provision of law enforced by the [FTC]," the FTC may seek a "permanent injunction" under section 13(b). 15 U.S.C. § 53(b). Second, the FTC may pursue monetary relief—both civil penalties under section

5(m) and consumer redress under section 19—but only where a defendant has notice that its conduct has violated a specific FTC rule or a final cease and desist order. *Id.* §§ 45(m)(1)(A)–(B), 57b(a)(1)–(2).

For decades, the FTC read the injunctive relief provision, section 13(b), as a sort of workaround to the notice requirement that also empowered it to seek monetary relief, as long as that relief was framed in terms of an "injunction." *See AMG*, 593 U.S. at 73–74. But four years ago, the Supreme Court unanimously rejected that reading. *Id.* at 75–82. The Court pointed to the limited situations in which the FTC Act expressly authorizes monetary relief, and reasoned that it was "highly unlikely that Congress would have enacted provisions expressly authorizing *conditioned* and *limited* monetary relief" in sections 5 and 19, "if the [FTC] Act, via § 13(b), had already implicitly allowed the [FTC] to obtain that same monetary relief and more without satisfying those conditions and limitations." *Id.* at 77 (emphasis in original). As the Court put it, the FTC Act sets out "a coherent enforcement scheme," under which injunctive relief is available under section 13(b), and monetary relief is only available via sections 5 or 19, and only after complying with the procedural protections laid out in those sections. *Id.* at 78.

**B.    The Gramm-Leach-Bliley Act**

The GLB Act, and in particular Title V that the FTC relies upon here, is a privacy and bank fraud law Congress enacted in 1999 to protect consumers' financial information. The FTC claims that this case implicates Subtitle II, "Fraudulent Access to Financial Information," 15 U.S.C. §§ 6821–6827, which protects consumers from practices like pretexting, *i.e.*, the creation of a fabricated identity or scenario to trick someone into

sharing sensitive information, such as by posing as a government or bank employee. *See* Press Release, FTC, *FTC Kicks off "Operation Detect Pretext,"* (Jan. 31, 2001), https://www.ftc.gov/news-events/news/press-releases/2001/01/ftc-kicks-operation-detect-pretext. Specifically, the FTC has invoked Subtitle II's main substantive provision, § 6821, *see* Compl. ¶¶ 1, 12, 131, which provides in relevant part:

> It shall be a violation of this subchapter for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person--
>
> > (1) by making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution;
> >
> > (2) by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or
> >
> > (3) by providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.

15 U.S.C. § 6821(a).

Consistent with its focus on financial institutions, Subtitle II authorizes "each Federal banking agency … , the National Credit Union Administration, and the Securities and Exchange Commission or self-regulatory organizations, as appropriate" to issue implementing "regulations." *Id.* § 6825. These financial agencies began regulating under Subtitle II shortly after its passage, focused largely on pretexting.[1]

---

[1] *See, e.g.*, Bd. of Gov'rs of Fed. Rsrv. Sys., *Identity Theft & Pretext Calling* (Apr. 26, 2001), https://www.federalreserve.gov/boarddocs/srletters/2001/sr0111.htm ("Fed Guidance"); FDIC *Guidance on Identity Theft & Pretext Calling*, FIL-39-2001 att. (2001),

## C.     The Fees Rule

Less than a month before filing this case, the FTC promulgated a new rule pursuant to the FTC Act governing just the sorts of fee disclosures at issue in this case—but only in the hotel and live event ticket industries, not rental housing. *See Trade Regulation Rule on Unfair or Deceptive Fees*, 90 Fed. Reg. 2066 (FTC Jan. 10, 2025) (to be codified at 16 C.F.R. §§ 464.1–5) (the "Fees Rule"). The rule provides that it is an unfair and deceptive trade practice for a hotel or live event ticket seller "to offer, display, or advertise any price of a covered good or service without clearly and conspicuously displaying the total price." 16 C.F.R. § 464.2(a). Yet that is just what the FTC alleges in this case. *See, e.g.*, Compl. ¶ 7. The FTC had originally proposed a broader rule that would have applied across all industries, including rental housing. *See generally Trade Regulation Rule on Unfair or Deceptive Fees, Notice of Proposed Rulemaking*, 88 Fed. Reg. 77420, 77427–28, 77438 (FTC Nov. 9, 2023). But it narrowed the scope of the final rule to just the hotel and live event ticket industries—and purposefully excluded the rental housing industry.

## D.     The Colorado Consumer Protection Act

The CCPA, like the FTC Act, prohibits "deceptive trade practice[s]." Colo. Rev. Stat. § 6-1-105(1). The CCPA sets out a more straightforward enforcement scheme than the FTC Act. To stop a person who "has engaged in or is engaging in any deceptive trade practice," the Colorado Attorney General may file a civil action seeking "a temporary

---

https://www.fdic.gov/news/financial-institution-letters/2001/fil0139a.html     (last     updated Mar. 24, 2024) ("FDIC Guidance").

restraining order or injunction, or both," and may also seek civil penalties. *Id.* §§ 6-1-
110(1), 6-1-112(1)(a).

## II.    Allegations in the Complaint

The Complaint names as defendants six different companies, and alleges that
defendants (generally, without specifying which ones but lumping all six together as
"Greystar") provide property management services for the owners of multi-family rental
buildings. *See* Compl. ¶ 3. Residents of those buildings pay their monthly rent, plus any
applicable fees, not to any of the six companies named in the Complaint, but to property
owners (*i.e.*, landlords). *See id.* ¶ 41. Property owners pay a property management
company, such as, here, defendant GREP Southwest, LLC, a portion of the owners'
income as a management fee. *Id.* ¶ 6.[2]

This case focuses on advertisements for rental units posted on various websites.
The Complaint alleges that "Greystar maintains websites for properties it manages …, as
well as its own general brand website, Greystar.com" and "also contracts with third-party
internet listing websites, such as Apartments.com and Zillow.com, to advertise Greystar
Managed Properties and their available units." *Id.* ¶ 44. According to the Complaint, rental
prices advertised on all three of those media reflected the monthly price of rent for a
particular unit. *Id.* ¶¶ 48–72. But, the Complaint alleges, those advertisements did not

---

[2] As explained in the accompanying declaration, only three of the six defendants, GREP
Southwest, LLC; Greystar California, Inc.; and Greystar Management Services, LLC
actually manage or provide ancillary services to multifamily rental properties. Only one of
those three defendants, GREP Southwest, LLC, manages multifamily rental properties in
Colorado, while Greystar California, Inc. does so exclusively in California. Greystar
Management Services, LLC only manages multifamily rental properties in Minnesota and
provides other ancillary services.

include certain mandatory fees, which vary by property, that residents agree to pay as part of their lease. *See, e.g.*, *id.* ¶¶ 52, 65, 70. The Complaint does not dispute that all mandatory fees for a property are disclosed in the lease each resident signs prior to renting. *Id.* ¶¶ 83–84, 86.[3]

The Complaint omits everything that happens between the display of base rent on a website and the signing of a lease. As commenters emphasized in response to the FTC's notice of proposed rulemaking that resulted in the final Fees Rule, "the landlord-tenant relationship involves an ongoing contractual relationship" and "is uniquely characterized by a series of transactions as opposed to a single-point transaction." Comments of Nat'l Ass'n of Apartments & Nat'l Multifamily Housing Council at 3, Docket No. R207011 (FTC Feb. 7, 2024) ("NAA Comments"), https://www.naahq.org/sites/default/files/2024-04/FTC-2023-0064-3133_attachment_2%20%281%29.pdf?_gl=1*1h1u2fb*_gcl_au*MTYxMjYxNzA2OC4xNzQ0MTMyNDIy*_ga*MzE0NjAwNTQ1LjE3MjYwMDI1Mzc.*_ga_70J0BCECMC*MTc0NDMxODI4Mi43LjAuMTc0NDMxODI4Mi42MC4wLjE3NDE3OTI5MDI. As a result, "the public policy considerations and concerns that are presented by typical consumer purchasing experiences in connection with many of the industries that may be plagued with 'bait and switch' tactics are entirely absent from or

---

[3] With respect to pre-lease fees such as an application fee or holding deposit, the Complaint does not allege that residents pay those fees without understanding the nature and amount of those fees. *See* Compl. ¶¶ 97–101. Nor does it allege that residents pay those fees without understanding the full cost to rent an apartment (for example, following a tour and a conversation with a property manager). Were this case limited to only those fees paid without knowledge of the full rental cost, it would be a materially different and much narrower case.

inapplicable to the rental housing industry." *Id.* Moreover, as the Complaint acknowledges, the defendant property management companies have made significant efforts to improve fee transparency on the websites that they and their property-owner clients maintain; unlike their competitors, for example, last year, Greystar's property management companies "began including a 'Fee Guide'" on these websites, including a list of "required," "optional," and "contingent" fees at each property, giving prospective residents notice of all fees before they even fill out a rental application. Compl. ¶ 66.

Plaintiffs brought this action on January 16, 2025, asserting four counts against all six defendants. Count I, brought by the FTC, alleges that defendants violated section 5 of the FTC Act, 15 U.S.C. § 45, and seeks injunctive relief. Compl. ¶¶ 122–124 & p. 50. Count II, brought by the FTC, alleges that defendants violated the GLB Act, 15 U.S.C. § 6821(a), and seeks monetary relief. *Id.* ¶¶ 128–131 & p. 50. Counts III and IV, brought by Colorado, allege that Greystar violated the CCPA, Colo. Rev. Stat. § 6-1-105, and seek civil penalties and injunctive relief. *Id.* ¶¶ 133–138 & p. 50.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss claims for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, the Complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Empls. Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1161 (10th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss claims for "lack of personal jurisdiction." Here, the Court must determine whether litigation in the plaintiff's chosen forum comports with principles of due process. *See Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1209, 1211–12 (10th Cir. 2000); *GCIU-Empl. Ret. Fund v. Coleridge Fine Arts*, 808 F. App'x 655, 663, 665–66 (10th Cir. 2020).

## ARGUMENT

### I. The FTC Fails to State a GLB Act Claim.

The FTC may not seek damages in this case. The Complaint is about allegedly deceptive advertisements for rental housing—just the sort of "unfair or deceptive acts or practices" that Congress specifically designed the FTC Act to combat. 15 U.S.C. § 45(a)(1). But the FTC has never issued a final rule about advertising practices in the rental housing industry, so after *AMG*, only injunctive relief is available. Enter the GLB Act, a relatively obscure statute that protects "customer information of a financial institution." 15 U.S.C. § 6821(a). The FTC would have this Court extend this statute to cover any and every transaction involving a credit card or bank account, including every time a resident pays rent (as long as it is not paid in cash).

The GLB Act's text and structure make clear it does not apply here. It regulates only conduct that is *targeted at* a consumer's *financial information*, which the FTC has not alleged. This case, in other words, has nothing to do with the GLB Act's regulatory object: financial fraud and identify theft. Accepting the FTC's more expansive reading would upend the FTC Act's carefully reticulated enforcement scheme. And the FTC has

indicated through its own conduct that that reading cannot be correct. Accordingly, the Court should dismiss Count II.

### A.    The Plain Text of the GLB Act Shows It Does Not Apply Here.

The GLB Act's text makes clear that Congress sought to regulate financial fraud and identity theft, not deceptive advertising. The relevant section makes it unlawful

> for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person … by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution[.]

15 U.S.C. § 6821(a)(2). Under a straightforward reading, the statute prohibits fraud in which someone uses a false statement to entice (or attempt to entice) a consumer to give or disclose "customer information of a financial institution." *Id.* The crux of the fraud is thus obtaining not just a consumer's money, but their *financial information*, for misuse.

The first (and for nearly two decades, only) enforcement action the FTC brought under the GLB Act presents a paradigmatic example. In that case, the defendants impersonated government officials and through cold calls to consumers, "claimed that the [consumers'] bank account information was needed" to maintain or increase government benefit payments. Compl. ¶ 10, *FTC v. Xtel Marketing, Inc.*, No. 04 C 7238 (N.D. Ill. Nov. 9, 2004), 2004 WL 3523308. After securing consumers' bank account information, defendants in *Xtel* used it to charge victims for fake drug-discount cards. *Id.* ¶¶ 12-13. In other words, they fraudulently obtained and misused customer financial information.

The FTC now goes far afield of section 6821's unambiguous scope. Advertisements to induce a consumer to buy a good or service are targeted at just that—

the sale of goods and services. The crux of the fraud in the case of an allegedly misleading advertisement is not obtaining and misusing the information associated with a financial institution, but making a sale of the advertised product. The "disclosure" of a customer's financial information—which by necessity occurs when they pay with a credit card or check as opposed to cash—is a mere coincidence.

Statutory context underscores what is clear from this textual analysis. First, a provision's "title and place in the statutory scheme" are appropriate guides to statutory meaning. *Dubin v. United States*, 599 U.S. 110, 121 (2023). Here, the relevant section and subsection of the GLB Act are titled, respectively, "Fraudulent Access to Financial Information" and "Privacy Protection for Customer Information of Financial Institutions." Pub. L. No. 106-102, § 521, 113 Stat. 1446 (1999). The GLB Act is thus concerned with preventing fraud targeted at financial information and protecting consumer privacy associated with financial institutions, not misleading advertising that results in a transaction that happens to be paid by credit card or check. Second, the two prohibitions surrounding section 6821(a)(2)—"making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution" and "providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation," 15 U.S.C. § 6821(a)(1), (3)—indicate that the statute is directed squarely at financial fraud.

Further, a neighboring section of the GLB Act calls on "Federal banking agenc[ies]" to issue regulations and guidelines aimed at ensuring that "financial institutions have

policies, procedures, and controls in place to prevent the unauthorized disclosure of customer financial information and to deter and detect activities proscribed under section 6821[.]" 15 U.S.C. § 6825. It would be strange, to say the least, for banking agencies to issue regulations and guidelines to banks on how to prevent allegedly misleading advertisements for rental housing. And predictably, the regulations promulgated under section 6825, regarding "Identity Theft and Pretext Calling," deal squarely with financial fraud. *See* Fed. Guidance, *supra* note 1; FDIC Guidance, *supra* note 1. That guidance identifies the provision of the GLB Act the FTC has invoked here as addressing "illegal conduct associated with identity theft and pretext calling," not, as the FTC would have it, every allegedly misleading statement that happens to result in a routine non-cash financial transaction. *See* Fed. Guidance *supra* note 1; FDIC Guidance *supra* note 1.[4]

Caselaw confirms what is clear from the text. In *Loughrin v. United States*, 573 U.S. 351 (2014), the Supreme Court rejected an argument that any fraud involving a bank was "bank fraud." *Id.* at 361–66. The statute at issue in *Loughrin* makes it a crime to execute a scheme "to obtain … property owned by, or under the custody or control of, a financial institution by means of false or fraudulent pretenses." 18 U.S.C. § 1344(2). The Court focused on the statutory phrase "by means of" to reject an interpretation that would

---

[4] The legislative history also weighs against the FTC's interpretation. The Conference Report accompanying the relevant section of the GLB Act explains that it bars a person from obtaining or causing to be disclosed customer information of a financial institution through fraudulent or deceptive means "such as by misrepresenting the identity of the person requesting the information or otherwise misleading an institution or customer into making unwitting disclosures of such information." H.R. Rep. No. 106-434, at 173 (1999) (Conf. Rep.), *as reprinted in* 1999 U.S.C.C.A.N. 245, 267.

result in the statute being "a plenary ban on fraud, contingent only on use of a check (rather than cash)." *Loughrin*, 573 U.S. at 362–63. The Court reasoned that "by means of" supplied "a relational component" requiring a nexus between the target and the means of the prohibited conduct. *Id.* As the Court explained, if the statute were read more broadly, it would extend to "every fraud, no matter how prosaic, happening to involve payment with a check." *Id.* at 361. Why? Suppose a "fraudster sells something to a customer, misrepresenting its value," such as by "pass[ing] off a cheap knock-off as a Louis Vuitton handbag." *Id.* "The victim pays for the bag with a good check, which the criminal cashes." *Id.* Under a broad reading of the statute, "bank fraud has just happened"—"the criminal has intended to 'obtain … property … under the custody or control of' the bank (the money in the victim's checking account), and has made 'false or fraudulent … representations' (the lies to the victim about the handbag)." *Id.* (citation omitted). But Congress's use of the phrase "by means of" limits the statute to those circumstances where the bank's involvement is not "fortuitous—a function of the victim's paying the fraudster by (valid) check rather than cash." *Id.* at 364–65.

Similarly, in *Dubin v. United States*, 599 U.S. 110 (2023), the Supreme Court analyzed the aggravated identity fraud statute, which makes it a felony to, "during and in relation to any [predicate] felony violation … knowingly transfer[], posses[s], or use[], without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1). The defendant was convicted for "overbill[ing] Medicaid for psychological testing" using documents that "included the patient's Medicaid reimbursement number (a 'means of identification')," which, the government argued, turned overbilling into identity

theft. 599 U.S. at 113–15. The Supreme Court reversed, because the government's reading would sweep in every crime that "happens to use ubiquitous payment methods" involving "names or other means of identification," such as "payment apps, credit and debit cards, a bill sent by mail, or an invoice sent electronically." *Id.* at 129. The Court held instead that the statute "is violated when the defendant's misuse of another person's means of identification is at the crux of what makes the underlying offense criminal, rather than merely an ancillary feature of a billing method." *Id.* at 114; *see also United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) (applying similar reasoning to a law prohibiting "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" because there was no nexus between the defendants' alleged fraud and customer payments (citation omitted)).

Applying the logic of *Loughrin*, *Dubin*, and *Berroa* to the GLB Act leads to the same result. The phrase "by making" supplies the "relational component" requiring a nexus between the target of the actual or attempted action (customer information of a financial institution) and the means of obtaining that target (a false, fictitious, or fraudulent statement or representation). *See Loughrin*, 573 U.S. at 362. The GLB Act is not a "plenary ban on [false or misleading statements], contingent only on use of a check [or credit card] (rather than cash)." *Id.* at 362–63. It does not apply in every case where the use of a customer's financial information is "wholly fortuitous—a function of the [customer]'s paying . . . by (valid) [credit card] rather than cash." *Id.* at 364. Instead, the phrase "by making" in the GLB Act serves the same function as "by means of" in the bank fraud statute: It shows that the false statement must be directed *at the financial*

*information*, rather than an unrelated topic that just happens to lead to a transaction in which a customer uses a credit card or bank account.

And the latter is just what the Complaint alleges here—there is no well-pleaded allegation that the advertising at issue specifically *targets financial information* for *fraudulent misuse*. Instead, the Complaint alleges that, unsurprisingly, advertising is targeted at convincing prospective residents to sign leases, which ultimately generates revenue for property owners. *See* Compl. ¶¶ 31, 109–110. To illustrate the absurdity of the FTC's interpretation: If the allegedly misled consumers paid in cash or by money order or cashier's check, the FTC indisputably would lack a GLB Act claim. *See id.* ¶ 128 (specifying that the information disclosed "includes consumers' bank account, credit card, and debit card numbers").

The closest the Complaint comes to alleging targeting of financial information is that plaintiffs "must provide" "financial information" to submit a rental application. *See id.* ¶¶ 73, 76(f), 100, 111–112. But that still does not make the financial information itself the *target* of the alleged fraud. Rather, the target of the allegedly misleading advertising here is indisputably convincing prospective residents to visit the property, explore renting an apartment, and eventually sign leases, which generates revenue for property owners. Obtaining financial information in a rental application is incidental to advertising's ultimate goal of leasing. That is clear because the identity of the "financial information" supplied by apartment residents when they apply for apartments does not matter to defendants: It may be *different* from the information they use to pay rent—for example, they may provide credit card information in a rental application but pay rent each month by check. The

Complaint does not allege otherwise. Thus, it is the leasing of an apartment, *not* the "customer information of a financial institution," that is the target of the Complaint's allegedly deceptive advertisements.

**B.    The GLB Act Did Not Fundamentally Alter the FTC's Enforcement Authority.**

Reading the GLB Act as a plenary ban on false or misleading advertisements would radically expand the FTC's ability to seek monetary damages. If the FTC were correct, the GLB Act would regulate virtually all advertising in the modern economy. Any business that allegedly engages in misleading advertising and allows customers to pay by credit card could face crushing monetary liability based solely on the method of payment. But long before the GLB Act, Congress had already enacted a general-purpose consumer protection statute that addresses just this sort of alleged conduct: the FTC Act. And the FTC Act expressly forbids monetary relief absent a rule or cease and desist order.

Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"—it does not, in the Supreme Court's words, "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Courts are thus rightly skeptical where an agency suddenly claims a newfound "power to create an alternative to [an] explicit and detailed remedial scheme" that Congress set out by statute. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1226 (10th Cir. 2017). The FTC's novel theory would be quite an elephant. It amounts to nothing less than a fundamental reordering of the FTC Act's entire enforcement scheme, suddenly allowing the FTC to rush into court seeking monetary relief for anything it deems misleading advertising, based on a "rule" laid out in the GLB Act that in fact says nothing at all about advertising.

Courts expect a clear statement from Congress with this sort of departure from a detailed statutory scheme. In *New Mexico*, for example, the Tenth Circuit invalidated a set of agency rules for resolving disputes between states and tribes over gaming compacts that were duplicative of an elaborate statutory scheme for resolving the same disputes. 854 F.3d at 1235. The agency had issued those rules to fill a gap left after the Supreme Court struck down the statute. *Id.* at 1233–35; *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). Even then, in light of the "explicit and detailed remedial scheme" Congress had enacted, the Court found it "implausible" that Congress would have authorized the agency to issue rules parallel to but different from that scheme without "do[ing] so in a clear manner." *New Mexico*, 854 F.3d at 1226. It is likewise implausible that Congress would quietly upend the FTC Act's similarly detailed enforcement scheme in a statute that on its face says very little about the FTC at all and certainly contains no clear statement.

The major questions doctrine further stands in the way of the government's reading. Courts are rightly "skeptic[al]" when an agency "claims to discover in a long-extant statute an unheralded power to regulate a 'significant portion of the American economy.'" *Util. Air Regul. Grp. v. EPA* ("*UARG*"), 573 U.S. 302, 324 (2014) (citation omitted). The Supreme Court has, in recent years, required an agency claiming such power to point to "clear congressional authorization." *Id.*; *see also, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (invalidating agency action where "[t]he Secretary ha[d] never previously claimed powers of this magnitude under" the relevant statute).

The FTC's new GLB Act-based enforcement power, if it existed, would have "vast 'economic and political significance.'" *UARG*, 573 U.S. at 324 (citations omitted). According to recent data, in 2022, credit and debit cards accounted for 166.1 billion transactions in the United States, totaling $10.4 trillion. *See* Bd. of Gov'rs of Fed. Rsrv., *Federal Reserve Payments Study: Cards and Alternative Payments*, 2021 and 2022 (rel. Nov. 2024), https://www.federalreserve.gov/paymentsystems/fr-payments-study.htm.[5] That is orders of magnitude larger than any economic impact the Supreme Court has found to trigger the major questions doctrine. *See, e.g.*, *Nebraska*, 600 U.S. at 488 ($430 billion); *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) ("billions of dollars of impact" (citation omitted)); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (nearly $50 billion as "a reasonable proxy" for "economic impact"); *UARG*, 573 U.S. at 322 (approximately $170 billion). That doctrine precludes the FTC's reading of the GLB Act.

**C.     The FTC's Own Conduct Confirms Its Novel Reading of the GLB Act Is Wrong.**

The FTC used the GLB Act only once in the statute's first two decades of existence. But in the short time since the *AMG* decision, the FTC has developed a new obsession, invoking the GLB Act at least nine times just in the past 22 months.[6] This is a transparent attempt to get around *AMG* and obtain money where the FTC is not entitled to collect it.

---

[5] Transactions in the rental housing industry alone are of vast significance. There are over 45 million occupied rental housing units in the U.S., with over 540 million monthly rental payments per year. *See* U.S. Census Bureau, *Housing Inventory Estimate: Renter Occupied Housing Units in the United States*, retrieved from FRED, Fed. Rsrv. Bank of St. Louis (updated Feb. 5, 2025), https://fred.stlouisfed.org/series/ERNTOCCUSQ176N.

[6] *See generally* Compl.; *FTC v. Doxo, Inc.*, 2024 WL 5119829 (W.D. Wash. Dec. 16, 2024); *FTC v. Fin. Educ. Servs.*, 2024 WL 3663069 (E.D. Mich. Aug. 5, 2024); Stip. Order,

Even if one assumes financial fraud and identity theft have skyrocketed since *AMG*, or that the FTC is policing such actions much more aggressively, this case would be a bridge further than the FTC's recent GLB Act cases—and a bridge too far. The only pre-*AMG* case involved a classic pretexting scheme. *Xtel*, 2004 WL 3523308. Many of the post-*AMG* cases the FTC has litigated involve schemes targeting consumers' financial information for fraudulent purposes; the others at least involve schemes by financial services companies. *See FTC v. Doxo, Inc.*, 2024 WL 5119829, at *1 (W.D. Wash. Dec. 16, 2024) (third-party bill payment platform disguised itself as an official payment channel); Tr. of Oral Ruling on Mot. to Dismiss at 39, *FTC v. Voyager Digital, LLC*, No. 1:23-cv-08960 (S.D.N.Y. May 22, 2024), ECF No. 74 (cryptocurrency financial services company made false representations to get consumers' "bank account and cryptocurrency wallet information"); *FTC v. Celsius Network Inc.*, 2023 WL 8603064, at *1–2 (S.D.N.Y. Dec. 12, 2023); *FTC v. Fin. Educ. Servs.*, 2023 WL 8101841, at *1 (E.D. Mich. Nov. 21, 2023); *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368 (S.D.N.Y. 2023). This case, by contrast, does not involve a financial services provider, nor are there any allegations of financial fraud or identity theft.

The Court made crystal clear in *AMG* that "[i]f the [FTC] believes [its] authority too cumbersome or otherwise inadequate, it is, of course, free to ask Congress to grant it

---

*FTC v. Invitation Homes, Inc.*, No. 1:24-cv-04280 (N.D. Ga. Sept. 27, 2024), ECF No. 21; *FTC v. Start Connecting LLC*, 2024 WL 3990084 (M.D. Fla. July 11, 2024); *FTC v. Celsius Network Inc.*, 2024 WL 1619360 (S.D.N.Y. Apr. 12, 2024); Compl., *FTC v. Voyager Digital, LLC*, 1:23-cv-08960 (S.D.N.Y. Oct. 12, 2023), ECF No. 1; *FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368 (S.D.N.Y. 2023); *FTC v. BCO Consulting Servs., Inc.*, 2023 WL 4291446 (C.D. Cal. May 22, 2023).

further remedial authority." 593 U.S. at 82. And it has. In 2021, the FTC's then-Acting

Chair called on Congress to pass *new legislation* enabling the FTC to seek monetary

relief without first going through a rulemaking, as it had done before *AMG*. Tellingly, that

testimony made no mention of the GLB Act. *See* Prepared Statement of Rebecca Kelly

Slaughter, FTC, *Testimony Before the Subcomm. On Consumer Prot. And Com. Of the*

*H. Comm. On Energy and Com.* (Apr. 27, 2021), https://www.ftc.gov/system/files

/documents/public_statements/1589400/p180500house13btestimony04272021.pdf.[7]

The FTC has therefore made no secret of the fact that, after *AMG*, it does not have

authority to pursue monetary relief as it has chosen to do here.

Furthermore, just a month before filing this action, the FTC issued a new rule

governing precisely the sort of fee disclosures at issue in this case. To state the obvious:

There would be no need for such a rule if the GLB Act already covers fee disclosures.

And yet the FTC has not relied on that rule in this case because it does not apply here—

in a bipartisan compromise between the majority and minority Commissioners, the FTC

narrowed the rule to cover only the hospitality and live event ticketing industries,

---

[7] In a "progress report" on his tenure at the FTC released the day this lawsuit was filed,
the then-Director of the FTC's Bureau of Consumer Protection stated that "a fix to our
13(b) authority is badly needed," and linked to a press release criticizing *AMG* and
summarizing that testimony by then-Acting Chair Slaughter. Samuel Levine, *State of the
Bureau: A BCP Progress Report*, FTC Blog (Jan. 16, 2025), https://web.archive.org/web
/20250126182548/https://www.ftc.gov/business-guidance/blog/2025/01/state-bureau-
bcp-progress-report. He also wrote to the Governor of Colorado urging a legislative fix,
saying that, "[a]lthough the FTC's [new Fees Rule] is limited to two industries," he "hope[d]
the FTC's recent rulemaking and enforcement experience provides useful insight" for
future *legislation* in Colorado. Letter from Samuel Levine, FTC, to Governor Jared Polis,
at 3 (Jan. 15, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/letter-of-sam-levine-to-
governor-polis-re-junk-fees.pdf.

specifically <u>excluding</u> rental housing. *See* Fees Rule, 90 Fed. Reg. 2083, 2089. Because by their very nature, these industries virtually *require* non-cash payment, the FTC's reading of the GLB Act would render the narrowed rule superfluous.

*      *      *

As statutory text and agency practice make clear, the GLB Act is a banking statute—it is not a "get out of *AMG* free" card. The Court should dismiss Count II.

## II.    The FTC Does Not Plausibly Allege that Consumers Relied on the Challenged Advertisements.

The Court should dismiss Count II, the FTC's only count seeking monetary relief, for the additional reason that the FTC does not plausibly allege that consumers actually relied on the advertisements at issue. To receive monetary relief under section 19 of the FTC Act, the FTC must establish that such relief is "necessary to redress injury to consumers or other persons, partnerships, and corporations *resulting from* the rule violation or the unfair or deceptive act or practice." 15 U.S.C. § 57b(b) (emphasis added). And in a deceptive advertising case, "if the [consumer] did not rely on the misrepresentation, then the misrepresentation is not a cause in fact of harm." 2 Dan B. Dobbs, *Law of Remedies* § 9.2(6), at 570 (2d ed. 1993).

The Complaint lacks any allegation that a consumer would not have signed a lease if they had been apprised via advertisement of all mandatory fees. Allegations that consumers have "complained" after learning of fees, Compl. ¶ 104, do not establish actual reliance. To the contrary, the Complaint alleges that "[s]ome prospective tenants … chose *not* to sign the rental agreement" due to the mandatory fees. *Id.* ¶ 105 (emphasis added). That fact underscores that prospective residents have many decision-making junctures—

21

including a juncture after the application process before signing a lease. Indeed, as the Complaint acknowledges, residents must go through an "entire application process." *See id.* ¶ 46. Unlike, for example, ticket sales, prospective residents cannot make a purchase instantaneously upon seeing an advertisement—they must instead fill out an application and review and sign the lease, and the process almost always includes more extensive contact with the property, such as a tour of the property and/or unit and in-person or phone conversations with property staff. *See* NAA Comments at 3.[8]

Because the Complaint does not allege that supposed failure to disclose fees was a but-for cause of any consumer paying such a fee, Count II should be dismissed.

**III.    Plaintiffs Do Not Plausibly Allege that the Challenged Advertisements Are Deceptive.**

The FTC fails to state a claim under section 5 of the FTC Act in Count I and Colorado fails to state a claim under the CCPA in Counts III and IV because the advertisements at issue are not deceptive within the meaning of either statute.

Liability under both statutes requires an actual tendency to mislead. To establish liability under section 5 of the FTC Act, the FTC must "show the business entity made material representations *likely to mislead* ordinary consumers to their detriment." *FTC v.*

---

[8] Nor can the FTC rely on any "presumption" of reliance based on the dissemination of the advertisements. Although the Tenth Circuit has recognized such a presumption in the context of section 13(b) claims for equitable monetary relief (which are no longer available post *AMG*), *see FTC v. Freecom Comm'c'ns, Inc.*, 401 F.3d 1192, 1205–06 (10th Cir. 2005), it has never extended that holding to section 19 claims. This Court should not do so for the first time. Unlike section 13(b), section 19 expressly ties the availability of relief to actual, retrospective consumer harm. 15 U.S.C. § 57b(b) (authorizing "such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations").

*Freecom Comm'c'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005). Under the CCPA, an actionable misrepresentation is "a false or misleading statement that *induces the recipient to act or refrain from acting.*" *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003) (emphasis added).

Courts applying statutes like the FTC Act and CCPA to similar fee-disclosure allegations have held that, as a matter of law, an advertisement is not deceptive if fees are disclosed before the consumer completes the transaction. *See, e.g., Washington v. Hyatt Hotels Corp.*, 2020 WL 3058118, at *3–5 (N.D. Ill. June 9, 2020) (dismissing fee-disclosure claim against hotel company because fees were displayed on final booking page prior to payment); *Harris v. Las Vegas Sands LLC*, 2013 WL 5291142, at *5–6 (C.D. Cal. Aug. 16, 2013) (same); *Ford v. Hotwire, Inc.*, 2008 WL 5874305, at *1–2 (S.D. Cal. Feb. 25, 2008) (dismissing fee-disclosure claim against hotel booking site because consumers had to accept terms of service, which plainly stated hotels' mandatory fees were not included in advertised rate and were paid directly to hotel).

So too here. According to the FTC's own allegations, the mandatory fees at issue here are disclosed in the lease prior to signing. Compl. ¶¶ 83–84, 86. As a result, no resident pays a fee required under the lease without first knowingly agreeing to pay it. Plaintiffs therefore do not plausibly allege that the advertisements at issue are likely to deceive consumers, or induce them to act or refrain from acting, by the time they are charged the mandatory fees.

To the extent the FTC's allegations of reliance relate to fees paid prior to the signing of the lease, such as application fees and holding deposits, *see, e.g.*, Compl.

¶ 100, the Complaint does not plausibly allege that consumers paid *those* fees in reliance on online advertisements either. For one thing, the Complaint does not distinguish between applicants who paid such fees, including application fees, before versus after they have visited the property, toured the apartment unit, spoken with a property manager, and discussed the total monthly leasing price; an allegation that consumers "relied" on an advertised price is implausible in light of how the application and leasing process actually works. Moreover, the Complaint acknowledges that the advertisements at issue "refer[] to the rent price, exclusive of [the challenged fees], as 'base rent.'" *Id.* ¶ 34. The word "base" necessarily and commonly implies there is more to be added on top of the listed amount. *See Base*, *Webster's Third New Int'l Dictionary* (1986).

To be sure, some courts have held that, under the FTC Act, the deceptiveness of a given advertisement must be determined in isolation from any subsequent disclosures of accurate information. *See, e.g.*, *Carter Prods. v. FTC*, 186 F.2d 821, 824 (7th Cir. 1951). But the Tenth Circuit has never endorsed that rule. Moreover, the rule's application makes little sense in a context like residential leasing, which necessarily involves a protracted application process extending far past a single pricing disclosure and results in a complex contractual relationship with numerous obligations on both parties, financial and otherwise. In short, any ordinary consumer who has ever leased an apartment understands that there will be more to the eventual lease contract than what is conveyed via a short online advertisement. Such ads are therefore not likely to mislead.

IV.    **The Complaint Fails to State a Claim Against Each Defendant.**

Under Federal Rule of Civil Procedure 8(a)(2), "the burden rests on the plaintiffs to provide fair notice of the grounds for the claims made against *each* of the defendants." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis added). When plaintiffs fail to specify which defendant is alleged to have committed which unlawful act, the complaint must be dismissed for impermissible group pleading. *Id.* Furthermore, Rule 9(b), which applies to claims brought under the CCPA, *see Murtagh v. Bed Bath & Beyond Inc.*, 2020 WL 4195126, at *5 (D. Colo. July 3, 2020), *report and recommendation adopted*, 2020 WL 4193553 (D. Colo. July 21, 2020), requires that a complaint alleging fraud "sufficiently apprise the defendant of its involvement in the alleged fraudulent conduct," *Clinton v. Sec. Bene. Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023) (citation omitted) (alterations adopted).

Here, the Complaint fails to satisfy either rule, as it contains no specific allegations as to any of the six defendant companies' involvement in the dissemination of the challenged advertisements. The Complaint simply alleges that "Greystar," defined to include all defendants, *see* Compl. ¶ 3, engaged in the advertising practices at issue. That falls far short of "provid[ing] fair notice of the grounds for the claims made against each of the defendants." *Robbins*, 519 F.3d at 1250; *see, e.g.*, *Simpson v. P.F. Chang's China Bistro, Inc.*, 2021 WL 8153748, at *4 (D. Colo. Nov. 4, 2021) (concluding that plaintiffs had engaged in impermissible group pleading where "nearly every allegation refer[red] to 'Defendants' generally, without specifying '*who* is alleged to have done *what*'" (quoting *Robbins*, 519 F.3d at 1250)). And that group pleading is especially problematic here

because multiple of the defendants have no involvement whatsoever in advertising or even property management for multifamily rental properties, let alone those in Colorado.

Nor may plaintiffs evade the requirements of Rules 8(a)(2) and 9(b) by alleging that defendants "have operated as a common enterprise." Compl. ¶ 20. The Tenth Circuit has never held that participation in a "common enterprise" is sufficient to expose one to liability under the FTC Act. And Colorado courts have never extended the common enterprise doctrine to the CCPA. This Court should not be the first to take that leap because here the allegations of common enterprise liability are "conclusory" and the Complaint "does not identify anything that [a given defendant] actually did to promote or facilitate the challenged conduct in th[e] case." *FTC v. Noland*, 2021 WL 289659, at *4 (D. Ariz. Jan. 28, 2021). All the Complaint alleges is that each defendant is one of a number of related businesses. *See* Compl. ¶¶ 14–20. Related how? It does not say. It also does not attribute the challenged advertisements to any particular defendant. In other words, it does not allege that any particular defendant played any role, however minor, in the challenged practices. That is impermissible group pleading under any theory.

## V.    The Court Lacks Personal Jurisdiction Over All Defendants Except for Greystar Management Services, LLC and GREP Southwest, LLC.

The Court lacks personal jurisdiction over defendants Greystar Real Estate Partners, LLC; GREP General Partner, LLC; Greystar RS National, LLC; and Greystar California, Inc. Subjecting them to suit in Colorado violates due process.

Under Tenth Circuit law, the Court must analyze the defendant's relationship with the forum state to determine whether it can constitutionally exercise jurisdiction. *See Peay*, 205 F.3d at 1212; *GCIU*, 808 F. App'x at 663, 665–66. In federal question cases

like this one, the inquiry turns on the limits of the Fifth Amendment, rather than the Fourteenth—but the "Due Process Clauses of the Fourteenth and Fifth Amendments are virtually identical." *Peay*, 205 F.3d at 1212; *see GCIU*, 808 F. App'x at 665 n.3 (assuming without deciding that the two standards are the same). Thus, the Tenth Circuit has rejected the proposition that due process requires nothing more than analysis of a defendant's "contacts with the United States as a whole." *Peay*, 205 F.3d at 1211. Instead, the inquiry turns on the relationship with the forum state, and the court must determine: "(1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the plaintiff's injury arose from those purposefully directed activities; and (3) whether exercising jurisdiction would offend traditional notions of fair play and substantial justice." *GCIU*, 808 F. App'x at 663 (citation omitted).

Dismissal of Greystar Real Estate Partners, LLC; GREP General Partner, LLC; Greystar RS National, LLC; and Greystar California, Inc. is appropriate here. None of these companies manages multifamily rental properties—or conducts any activities related to advertising for them—in Colorado. Decl. of Paolo Pizzi, ¶¶ 4–6, 8–11. Greystar Real Estate Partners, LLC, GREP General Partner, LLC, and Greystar RS National, LLC do not engage in advertising for multifamily rental properties at all. *Id.* ¶¶ 4–6. As for Greystar California, Inc., there are not even allegations that it conducts business in Colorado—and in fact, it conducts business *only* in California. *Id.* ¶ 8. These defendants therefore did not purposefully direct activities at Colorado that have a nexus with the

alleged injuries here. Accordingly, the Court lacks personal jurisdiction over these defendants.[9]

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims against all defendants for failure to state a claim and should dismiss all claims against all defendants but Greystar Management Services, LLC and GREP Southwest, LLC for lack of personal jurisdiction.

Date: April 16, 2025

Respectfully submitted,

JENNER & BLOCK LLP

/s/ Lindsay C. Harrison

Lindsay C. Harrison
Elizabeth Henthorne
Hilary R. Ledwell
Joshua J.W. Armstrong
1099 New York Ave., NW, Suite 900
Washington, DC 20001
(202) 639-6000
LHarrison@Jenner.com
BHenthorne@Jenner.com
HLedwell@Jenner.com
JArmstrong@Jenner.com

Jocelyn A. Sitton
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350
JSitton@Jenner.com

*Attorneys for Defendants*

---

[9] Nor may any subsidiary's advertising activities be imputed to a parent company. "A … parent company has a separate … existence and is treated separately from the subsidiary in the absence of circumstances justifying disregard of the corporate entity," namely that the subsidiary "is the general agent or alter ego" of the parent. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (internal quotation marks and bracket omitted).

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed using the Court's CM/ECF system. Service was effected by and through the Court's CM/ECF system.

Dated: April 16, 2025

/s/ Lindsay C. Harrison

Lindsay C. Harrison