**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-165

FEDERAL TRADE COMMISSION, and

STATE OF COLORADO, *ex rel.* PHILIP J. WEISER, ATTORNEY GENERAL,

    Plaintiffs,

    v.

GREYSTAR REAL ESTATE PARTNERS, LLC, *et al.*,

    Defendants.

**MOTION FOR LEAVE TO FILE BRIEF OF *AMICI CURIAE* NATIONAL APARTMENT ASSOCIATION AND NATIONAL MULTIFAMILY HOUSING COUNCIL AND ACCOMPANYING *AMICUS* BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

Page

INTEREST OF THE *AMICI CURIAE* ............................................................................... 1

MOTION OF NAA AND NMHC FOR LEAVE TO PARTICIPATE AS *AMICI CURIAE* .............................................................................................................................. 2

INTRODUCTION ............................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

    I.    The FTC's approach in this case makes little sense given the unique features of the rental housing industry. ............................................. 5

        A.    Housing providers cannot advertise a one-size-fits-all rental price for apartments. ........................................................................... 6

        B.    Renting an apartment is a long-term transaction governed by a lease. ................................................................................................ 8

    II.    Neither the FTC nor the rental housing industry has ever understood the GLBA to apply to renting an apartment—with good reason. ................................................................................................. 10

CONCLUSION ................................................................................................................. 14

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barrientos v. 1801-1825 Morton, LLC*,
  2007 WL 7213974 (C.D. Cal. Sept. 11, 2007) ........................................................ 13

*Ctr. for Biological Diversity v. Jewell*,
  2017 WL 4334071 (D. Colo. May 16, 2017) ............................................................. 2

*High Country Conservation Advocates v. United States Forest Serv.*,
  333 F. Supp. 3d 1107 (D. Colo. 2018) .................................................................. 2, 3

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ............................................................................................... 13

*Medina v. Cath. Health Initiatives*,
  2015 WL 13683647 (D. Colo. Oct. 7, 2015) ............................................................. 2

*Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*,
  293 F.3d 128 (3d Cir. 2002) ..................................................................................... 3

*Prairie Rivers Network v. Dynegy Midwest Generation, LLC*,
  976 F.3d 761 (7th Cir. 2020) .................................................................................... 3

*Sec. and Exch. Comm'n v. Cetera Advisors LLC*,
  2020 WL 13470960 (D. Colo. Aug. 25, 2020) ......................................................... 2

*Sgaggio v. Young*,
  2022 WL 970008 (D. Colo. Mar. 31, 2022) ............................................................. 2

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ......................................................................................... 11, 13

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ............................................................................................... 12

**Statutes and Other Authorities**

15 U.S.C. § 6821 ............................................................................................................ 12

15 U.S.C. § 6821(a) ....................................................................................................... 14

15 U.S.C. § 6821(a)(2) ................................................................................................... 11

Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1446 (1999) ......................... 10

H.R. Conf. Rep. 106-434 (1999), 106th Cong., 1st Sess. 1999, *as reprinted in* 1999 U.S.C.C.A.N. 245 ....................................................................... 10

*Trade Regulation Rule on Unfair or Deceptive Fees*, 90 Fed. Reg. 2066 (FTC Jan. 10, 2025) (to be codified at 16 C.F.R. §§ 464.15-5) .................................. 5

## INTEREST OF THE *AMICI CURIAE*

The National Apartment Association (NAA) serves as the leading voice and preeminent resource through advocacy, education, and collaboration on behalf of the rental housing industry. As a federation of 141 state and local affiliates, NAA encompasses over 96,000 members representing more than 12 million apartment homes globally. NAA believes that rental housing is a valuable partner in every community and emphasizes integrity, accountability, collaboration, community responsibility, inclusivity, and innovation. NAA and its network of affiliated apartment associations seek the fair governmental treatment of multifamily housing organizations, including by advocating for the interests of the rental housing business community at large in legal cases of national concern.

The National Multifamily Housing Council (NMHC) is where rental housing providers and suppliers come together to help meet America's housing needs by creating inclusive and resilient communities where people build their lives. NMHC advocates for solutions to America's housing challenges, conducts rental-related research, and promotes the desirability of rental living. Over one-third of American households rent, and over 21 million U.S. households live in an apartment home (buildings with five or more units).

**MOTION OF NAA AND NMHC FOR LEAVE TO PARTICIPATE AS *AMICI CURIAE***

NAA and NMHC respectfully move for leave to file a brief as *amici curiae* in this matter in support of Defendants' motion to dismiss. The proposed *amicus* brief is included below.[1] Before filing this motion, counsel for NAA and NMHC conferred with counsel for all parties pursuant to District of Colorado Civil Local Rule 7.1(a). Defendants consented to this motion and the filing of the *amicus* brief. Counsel for Plaintiffs indicated that Plaintiffs could not take a position before seeing the *amicus* brief itself.

District courts "have broad discretion in determining whether to allow participation by *amicus curiae*." *Sgaggio v. Young*, 2022 WL 970008, at *4 (D. Colo. Mar. 31, 2022); *see also Ctr. for Biological Diversity v. Jewell*, 2017 WL 4334071, at *2 (D. Colo. May 16, 2017). When evaluating *amicus* participation, courts look to Federal Rule of Appellate Procedure 29 "for guidance." *Sgaggio*, 2022 WL 970008, at *3 (noting that there is no "pertinent rule of civil procedure governing *amicus* participation in federal district courts") (internal quotations omitted). In particular, courts in this district have identified "the usefulness of the proposed brief [as] the most important factor for the Court to consider." *Sec. and Exch. Comm'n v. Cetera Advisors LLC*, 2020 WL 13470960, at *3 (D. Colo. Aug. 25, 2020); *see also Medina v. Cath. Health Initiatives*, 2015 WL 13683647, at *1 (D. Colo. Oct. 7, 2015) (likewise highlighting the importance of this factor). Courts thus consider whether the proposed brief provides a "unique perspective" that will be "helpful in understanding and analyzing the issues presented." *High Country Conservation*

---

[1] Pursuant to Civil Practice Standard 7.1A(2), NAA and NHMC have included their motion for leave to participate as *amici curiae* and the proposed *amicus* brief "in a single document."

2

*Advocates v. United States Forest Serv.*, 333 F. Supp. 3d 1107, 1116-17 (D. Colo. 2018), *vacated and remanded on other grounds by* 951 F.3d 1217 (10th Cir. 2020).

"Even when a party is very well represented, an amicus may provide important assistance to the court." *Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.). Here, NAA and NMHC provide a "helpful" and "unique perspective," formed by their position as leading advocates for the country's rental providers and suppliers. *See High Country Conservation Advocates*, 333 F. Supp. 3d at 1116-17. NAA and NMHC collectively represent nearly 100,000 combined members, and they have a deep and wide-ranging familiarity with the practical operation of the rental housing industry. NAA and NMHC's extensive engagement with the legal, regulatory, and practical aspects of the rental housing industry allows them to provide several functions courts have identified as useful: They "explain[] the broader regulatory or commercial context" in which this case arises and "provid[e] practical perspective on the consequences of potential outcomes." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 976 F.3d 761, 763 (7th Cir. 2020); *see also Neonatology Assocs.*, 293 F.3d at 132 (an *amicus* brief may assist the court by "explain[ing] the impact a potential holding might have on an industry") (quotation marks omitted).

For this reason, NAA and NMHC respectfully request that the Court grant them leave to participate as *amici curiae* and accept the proposed *amicus* brief, which is included below.

## INTRODUCTION

The Federal Trade Commission (FTC) proposes a novel interpretation of the Gramm-Leach-Bliley Act (GLBA) that dramatically expands the authority of the FTC in the name of policing "hidden" fees in the rental housing industry. According to the FTC, one sub-provision tucked away in the GLBA—a statute governing the financial industry—authorizes the FTC to penalize *any* purportedly false statement made by *anyone* who collects *any* payment made by credit or debit card. Under the FTC's approach, when a housing provider advertises the base rent for an apartment without including the full level of detail that appears in the lease, and a resident happens to pay by debit card, the housing provider is subject to federal liability under the GLBA. The same is true of any Girl Scout selling cookies who happens to collect payment by debit or credit card.

The FTC's theory is deeply flawed. Factually, it fails to account for the practical operation of the rental housing industry, through which residents communicate, often extensively, with property owners and property managers before signing a detailed long-term lease. And contrary to the FTC's stated purpose, its aggressive approach will harm apartment residents. If housing providers are forced to anticipate and advertise all permutations of the cost of renting an apartment, it will be more challenging and expensive for property owners to rent apartments, thus lowering the number of apartments on the market and limiting consumer choice. Likewise, stuffing advertisements full of potentially inapplicable fees will serve only to confuse consumers. Legally, the FTC's approach rests on an untenable interpretation of the GLBA, which would convert a narrow statute governing the financial industry into a far-reaching basis

4

for federal liability for any housing provider, retailer, or service provider who makes a purported false statement when accepting an electronic payment. The Court should reject the FTC's unsupported effort to federalize landlord-tenant communications and grant the motion to dismiss.

## ARGUMENT

**I.     The FTC's approach in this case makes little sense given the unique features of the rental housing industry.**

The FTC has the laudable goal of protecting consumers by eliminating "hidden" fees. But this campaign against "hidden" fees cannot sensibly be applied to the rental housing industry. The FTC's own decisionmaking in a related context illustrates the point.

Specifically, the FTC recently issued its final "Trade Regulation Rule on Unfair or Deceptive Fees." 90 Fed. Reg. 2066 (FTC Jan. 10, 2025) (to be codified at 16 C.F.R. §§ 464.15-5).[2] The Rule recites that "it is an unfair and deceptive practice for businesses to offer, display, or advertise any price of live-event tickets or short-term lodging without clearly, conspicuously and prominently disclosing the total price." The Rule is thus a "hidden fees" regulation limited to two industries: (1) live-event tickets and (2) short-term lodging, such as hotel accommodations. The FTC's Notice of Proposed Rulemaking, on the other hand, had been much broader; it would have prohibited unfair or deceptive fees in *all* sectors of the economy, including the rental housing industry. The FTC purposefully omitted the rental housing industry (among others) from the regulation's coverage after receiving extensive public comments highlighting important differences between the

---

[2] The Rule is available at https://www.ftc.gov/system/files/ftc_gov/pdf/r207011_udf_rule_2024_final_0.pdf.

5

rental housing industry and the industries ultimately covered by the Rule.  *See* Rule at 83.

The FTC was right to do so.  Unlike with sales of short-term lodging, it is challenging—and affirmatively unhelpful to consumers—for housing providers to attempt to communicate any form of "final" price untethered from a particular resident.  Nor is there a need for housing providers to do so.  Unlike in the short-term lodging industry, apartment residents have extensive opportunities to engage with a property owner or manager to learn the full cost of their apartment before submitting an application or signing a lease.

The FTC now is attempting to do through ad hoc litigation what it did not do in its rulemaking.  This makes no sense and the Court should reject FTC's effort.

### A. Housing providers cannot advertise a one-size-fits-all rental price for apartments.

It is nearly impossible for many housing providers to foreseeably predict the total price of a rental unit in order to disclose it in an advertisement.  To start, the advertised rental price for units in an apartment building is typically a base price, which is then adjusted to account for the characteristics of a particular unit and lease, such as the unit's location in the building and the length of the rental term.  Even if the base rent remains the same, the fees associated with a particular unit will vary according to the needs and preferences of a particular resident.  The payment due for utilities such as gas, water, sewer, and electric will likely vary based on usage, and therefore it is impractical for housing providers to advertise these fees on a prospective basis. On top of that, utilities are typically provided by third parties, who set (and change) their rates with no notice or

6

input from housing providers.

This problem is not limited to utility fees. There are situational fees that some residents will never owe—for example, late fees, fees for bad checks or insufficient funds, credit card processing fees, penalties for lease violations, or fees for changing the locks. These fees are mandatory for residents who trigger their application, but some residents will never fall into that category and so never need to pay them. In addition to these fees, there are any number of personalized add-ons for an apartment, among them TV and internet services, parking, and additional rent for pets. While the FTC purports to focus on "mandatory" fees (Compl. ¶¶ 3, 5, 32), the FTC's theory of deceptive advertising would seem to encompass optional services that will become part of the rent for any resident who chooses those services.

The FTC's demand that housing providers advertise a complex menu of pricing options covering all possible total-price permutations (or no price at all) imposes a massive logistical hurdle on housing providers. This approach will force housing providers to turn every advertisement into a lengthy and complex menu—akin to forcing restaurants to print the price impact of every possible modification to every menu item in the menu itself, rather than allowing servers to deliver the information on an individualized basis. The upshot of the FTC's approach will be significant burdens on housing providers and confusion for residents, all of which could be avoided by relying on individualized interactions between housing providers and residents for disclosure of the final lease and fee arrangement for a particular apartment.

### B. Renting an apartment is a long-term transaction governed by a lease.

As suggested by the discussion above, the process of renting an apartment is entirely different from a quick, one-off internet transaction for a hotel room or concert ticket. To start, the rental process involves ongoing, personalized interactions between the prospective resident and the property owner or manager. Prospective residents typically have the opportunity to visit an apartment building to tour a unit. At that point they can gather information and ask questions about the property and the specific details of the leasing arrangement before submitting an application, whether in-person and online. This interaction may continue for days or weeks up through the signing of the lease, when prospective residents again have the opportunity to review the rental agreement and ask questions before signing the agreement. It is through these repeated interactions that a particular resident learns the specific details, including total cost, of renting their particular unit.

The properties highlighted in the Complaint illustrate as much. The website for the "Broadstone on 9th" complex in Denver—discussed extensively in the Complaint (*e.g.*, Compl. ¶¶ 55-57, 79-80)—invites potential residents to schedule an appointment or visit the office for the property, open seven days a week.[3] Potential residents can submit their preferred move-in date, unit type, and other information (including, for example, whether they have pets) and then request that the office contact them to discuss available units. That complex is hardly unique. The Hamilton Crossing complex in Riverton, Utah (Compl.

---

[3] *Broadstone On 9th*, https://www.broadstoneon9th.com/ (last visited Apr. 22, 2025).

¶¶ 93-96) likewise invites prospective residents to call or visit.[4]  So too does the Avia Lowry complex in Denver.[5]  As these websites reflect, choosing to rent an apartment is a significant commitment typically made after extensive opportunities to evaluate the details of a particular arrangement, including through in-person visits and phone calls.  And a resident normally need not make any meaningful financial commitment before learning the "total" fee for their preferred unit.

The process of renting an apartment is thus categorically different from clicking through a website to purchase a hotel room for the weekend.  As the FTC explains in its Rule, the "offered goods and services" in the short-term lodging industry are "nearly identical," and "the most salient feature is the total price."  Rule at 22-23.  In other words, "hotel rooms are interchangeable so long as the location, star rating, and reviews are similar across offers, and what matters most is the total price."  *Id.* at 23.  When "hidden" fees arise at the tail end of booking a hotel room, it defeats the consumer's ability to compare prices and shop effectively.

Rental housing units, on the other hand, typically are *not* interchangeable, even within the same building.  While price is certainly a critical feature of renting an apartment, most residents will not sign a lease based on a review of a website and the website's pricing information alone.  Rather, most prospective residents will visit a building to tour the available units and speak with the property owner or manager to learn more about the property and units.  During this process there normally will be additional discussion of the

---

[4] *Hamilton Crossing*, https://www.hamiltoncrossingutah.com/ (last visited Apr. 22, 2025).
[5] *Avia*, https://www.avialowry.com/ (last visited Apr. 22, 2025).

potential total price for the units. The fees that accompany the base rent are not "hidden" or "junk" fees that pop up unexpectedly on a check-out page, but instead are a key focus of any discussion between a housing provider and resident.

Renting an apartment is also fundamentally different from purchasing a hotel room because the landlord-tenant relationship represents an ongoing contractual relationship—typically a year or longer—that is categorically different from a single-point transaction. The FTC envisions that housing providers will advertise a single, all-encompassing fee, but a resident's rental rate may change over time to accommodate any number of changing circumstances, such as adding or subtracting a parking spot or a pet. Moreover, the ongoing rental relationship is subject to extensive state and local regulation: All fifty states and the District of Columbia have enacted landlord-tenant laws to protect the parties to a real-estate transaction, including with respect to what qualifies as "rent," security deposit and fee regulations, and required lease and fee disclosures. As a result, the process of renting an apartment does not present the same risk of predatory consumer practices that may exist in the short-term lodging industry.

## II. Neither the FTC nor the rental housing industry has ever understood the GLBA to apply to renting an apartment—with good reason.

The GLBA addresses consumer privacy concerns in the financial industry, and that is all it was ever intended to do. *See* Pub. L. No. 106-102, 113 Stat. 1446 (1999). Specifically, the GLBA includes a comprehensive set of privacy protections that were enacted to "provid[e] consumers with new protections with respect to the transfer and use of their nonpublic personal information *by financial institutions*." H.R. Conf. Rep. 106-434 (1999), 106th Cong., 1st Sess. 1999, *as reprinted in* 1999 U.S.C.C.A.N. 245, 265

10

(emphasis added). As part of these privacy protections, Congress also prohibited "obtain[ing] … consumer information of a financial institution … by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution." 15 U.S.C. § 6821(a)(2). As described in Greystar's brief (at 9-21), this provision targets fraud for the purpose of obtaining and misusing consumer financial information; it is not a general false advertising statute. *See West Virginia v. EPA*, 597 U.S. 697, 721 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Given the focus of the GLBA, neither the FTC nor the rental housing industry has ever understood this statute—enacted over 25 years ago—to apply to apartment rentals.

Under the FTC's newfound interpretation of the GLBA, the statute applies whenever someone happens to pay for *anything* with a credit or debit card—from an automobile to a pack of gum, with rental housing in between. As Plaintiffs make clear in their Complaint, their theory is that Defendants made purportedly "false, fictitious, or fraudulent statements" to potential residents—"customers of financial institutions"—to obtain "consumers' bank account, credit card, and debit card numbers." Compl. ¶ 128. While Plaintiffs allege that "Greystar uses its misrepresentations to entice consumers to hand over their financial information," Compl. p. 43 (capitalization altered), the point is not that Defendants then used this financial information for some illicit purpose, such as to steal residents' money from their bank accounts. Rather, Plaintiffs allege that Greystar uses a resident's financial information to pay the application and rental fees for the unit

11

Case No. 1:25-cv-00165-CNS-STV   Document 35   filed 04/23/25   USDC Colorado
pg 16 of 20

the resident has chosen to rent. Compl. ¶ 112. The object of the alleged fraud is the payment, not the financial information.

This theory is in no way limited to renting an apartment. Whenever consumers provide a retailer or service provider with, say, a credit card number, the retailer or service provider is—according to the FTC—obtaining consumers' financial information under 15 U.S.C. § 6821. Thus, to the extent the FTC believes that the retailer or service provider made "a false, fictitious, or fraudulent statement or representation," the retailer or service provider is now on the hook for liability under the GLBA. Say, for example, a consumer uses her credit card to purchase a purportedly hand-sewn needlepoint pillow at a craft market. In fact, the pillow was not hand-sewn, but rather made in a factory. Is the pillow purveyor now subject to liability under the GLBA? According to the FTC, the answer is yes. The same would be true for a housing provider who accepts rent payments by debit card, and falsely advertises the apartment as having a shorter commute to the city center than it actually does. Under the FTC's logic, that is a GLBA violation.

There is no indication Congress intended this minor sub-provision in the GLBA to function as a federal truth-in-advertising statute covering any transaction that happens to involve a credit or debit card. Indeed, under the FTC's reading of the provision, the GLBA would operate not as an industry-specific statute, but as another FTC Act—that is, an expansive and duplicative mandate to prevent unfair methods of competition. *See* 15 U.S.C. §§ 41-58. But as the Supreme Court has repeatedly recognized, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). If Congress had intended the GLBA to provide the FTC yet another means

to police false advertising, one might have expected them to say so. *See id.* Thus, even if there were "a colorable textual basis" for the FTC's power grab, "common sense as to the manner in which Congress [would have been] likely to delegate such power" makes "it very unlikely that Congress" in fact handed the FTC this authority through the GLBA. *West Virginia*, 597 U.S. at 722-23 (quotation omitted; alterations in original).

The FTC's interpretation is particularly unconvincing in light of the longstanding recognition that landlord-tenant relations are typically left to the States. *See Barrientos v. 1801-1825 Morton, LLC*, 2007 WL 7213974, at *10 (C.D. Cal. Sept. 11, 2007) ("The Supreme Court has recognized that the housing provider-resident relationship is an area of traditional state regulation."); *cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982) ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the housing provider-resident relationship in particular."). As the Complaint reflects, virtually all rental payments are made through a bank account or credit card. *See, e.g.*, Compl. ¶ 100 (alleging that "Greystar requires prospective residents submitting applications online to provide financial information to pay their application fees and other charges using a debit card, credit card, or bank account."). Under the FTC's theory, then, any allegedly false statement by a housing provider would subject the housing provider to *federal* liability under the GLBA. The FTC's approach would therefore federalize housing provider-resident communications. There is no indication in the statute that Congress intended the GLBA to allow federal agencies to intrude on traditional areas of state regulation simply because there is some connection to a credit card payment.

13

Not only is there no indication Congress understood the GLBA as a broad prohibition on false advertising, the FTC's approach makes no sense. According to the FTC, the GLBA applies if residents pay fees and rent through a method that provides the housing provider with access to their financial information: a debit or credit card, or a check. When residents pay rent using cash, money order, or cashier's check, those payments will not come within the ambit of 15 U.S.C. § 6821(a), which requires "obtain[ing] … consumer information of a financial institution." But if the FTC's concern is hidden fees in the rental housing industry, there is no reason that concern should be limited to payments made via credit card or bank account, as opposed to cash, money order, or cashier's check. This disconnect exists because the GLBA focuses on false statements made for the specific purpose of obtaining a consumer's financial information—where use of the financial information is the end goal, and not merely a means of completing a transaction. By twisting the statute to cover any statement made in connection with a transaction that happens to involve a credit or debit card, the FTC has entirely unmoored the statute from its clear purpose.

## CONCLUSION

For the foregoing reasons, NAA and NMHC respectfully request that the Court grant their motion for leave to participate as *amici curiae* and grant Defendants' motion to dismiss.

Dated: April 23, 2025                    Respectfully submitted,

                                         */s/ Jaime A. Santos*

Paula Cino (Co-Counsel)                  Jaime A. Santos
NATIONAL MULTIFAMILY HOUSING COUNCIL     GOODWIN PROCTER LLP
1775 I Street NW, Suite 1100             1900 N Street NW
Washington, DC 20006                     Washington, DC 20036
(202) 974-2300                           (202) 346-4000
                                         jsantos@goodwinlaw.com

Ayiesha Beverly (Co-Counsel)
NATIONAL APARTMENT ASSOCIATION           Kevin P. Martin (Co-Counsel)
4300 Wilson Boulevard, Suite 800         Jordan Bock (Co-Counsel)
Arlington, VA 22203                      GOODWIN PROCTER LLP
(703) 518-6141                           100 Northern Avenue
                                         Boston, MA 02210
                                         (617) 570-1000

                                         *Counsel for Amici Curiae the National*
                                         *Apartment Association and the National*
                                         *Multifamily Housing Council*

15

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Colorado by using the court's CM/ECF system on April 23, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated: April 23, 2025

*/s/ Jaime A. Santos*
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4000
jsantos@goodwinlaw.com

*Counsel for Amici Curiae the National Apartment Association and the National Multifamily Housing Council*