# EXHIBIT A

O5GHFedO

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   FEDERAL TRADE COMMISSION,

4                   Plaintiff,

5            v.                           23 Civ. 8960 (GHW)

6   VOYAGER DIGITAL LLC, et al.,
                                          Oral Argument
7                                         and Decision

8                   Defendants.
    -------------------------------x
9                                         New York, N.Y.
                                          May 16, 2024
10                                        3:00 p.m.

11  Before:

12                      HON. GREGORY H. WOODS,

13                                        District Judge

14                          APPEARANCES

15  FEDERAL TRADE COMMISSION
    BY:  MARK LAWRENCE GLASSMAN
16       QUINN MARTIN
         SANYA SHAHRASBI
17

18  COZEN O'CONNOR
         Attorneys for Defendants Stephen and Francine Ehrlich
19  BY:  SARAH KRISSOFF
         -and-
20  DAY PITNEY, LLP
    BY:  MATTHEW LETTEN
21       HELEN HARRIS

22

23

24

25
```

O5GHFedO

1              (The Court and all parties present remotely)

2              THE COURT:  Thank you very much.

3              What I'd like to do is take appearances from the

4     parties.  I'm going to ask that the principal spokesperson for

5     each side identify him or herself and the members of their team

6     rather than having each lawyer introduce themselves

7     individually.

8              Let me start with counsel for plaintiff.  Who's on the

9     line for plaintiff?

10             MR. GLASSMAN:  Hello, your Honor.  My name is Mark

11    Glassman.  I will be the principal counsel today, and with me

12    are my colleagues Quinn Martin and Sanya Shahrasbi.

13             THE COURT:  Thank you.

14             Who's on the line for defendants?

15             MS. KRISSOFF:  Good afternoon, your Honor.  This is

16    Sarah Krissoff representing Mr. and Mrs. Ehrlich.  I'm joined

17    also by my colleagues Helen Harris and Matt lud inch.

18             THE COURT:  Very good.  Thank you very much.

19             Let me start with a few brief instructions about the

20    rules that I'd like the parties to follow during this

21    conference.

22             First thing I want to do is to remind you that this is

23    a public proceeding.  Any member of the public or press is

24    welcome to dial in to this conference.  I'm not monitoring

25    whether third parties are auditing the conference.  They're

O5GHFedO

1    perfectly welcome to do so, however.  So I wanted to remind you

2    of that possibility.

3            Second, please keep your phones on mute at all times

4    unless you're intentionally speaking to me or to the

5    representative of a party.  You should do that even if you do

6    not think that there is background noise wherever you may be.

7            Third, please state your name each time that you

8    speak.

9            Fourth, please abide by instructions from our court

10   reporter that will help her do her job.

11           And finally, I'm ordering that there be no recording

12   or rebroadcast of all or any portion of today's conference.

13           So, counsel, with all of that out of the way, I

14   scheduled this conference to discuss the motion to dismiss

15   filed by the Ehrlichs.  Those are Steven Ehrlich and Francine

16   Ehrlich, which I will jointly refer to as the Ehrlich

17   defendants.

18           Counsel, I believe that I have a sense of the motion;

19   however, would like to give each of the parties an opportunity,

20   if you wish, to add anything to your written submissions.

21   Again, I've reviewed your written submissions.  The question is

22   if there's anything that you would like to add for purposes of

23   my consideration of the motion.

24           First, counsel for defendants.

25           MS. KRISSOFF:  Yes, your Honor, just very briefly.  I

O5GHFedO

1    think — I know your Honor is well-prepared and has reviewed

2    all the materials.

3            There are a number of issues here that we think give

4    rise to the motion to dismiss, and I'm sure your Honor will

5    focus some questions on those issues shortly, but there are a

6    few things we did want to bring to your attention.  One is,

7    really, the paucity of allegations supporting the relief

8    defendant claims here.  The FTC has chosen not to amend the

9    complaint and add, really, any detail or, frankly, any theory

10   about why proceeds of stock transfers or proceeds from a family

11   home were ill-gotten gains.  And because of that, we think the

12   claims against Mrs. Ehrlich should be dismissed.  Even sort of

13   under a very favorable standard for the FTC, we don't believe

14   they've adequately pled claims against Mrs. Ehrlich.

15           With regard to the other arguments in our brief, I did

16   want to note we spent a lot of time talking about the lack of

17   plausible allegations regarding the violations of the FTC Act

18   and, in particular, individual liability for those statements

19   of Voyager.  And what's clear in the briefing is that the FTC

20   has very much focused on two things to establish the requisite

21   knowledge, and they have to show ability to control and some

22   sort of knowledge, either participation in the statements, a

23   reckless indifference, or burying-their-head-in-the-sand type

24   of knowledge.  And the FTC, there is literally a single

25   paragraph in the complaint — and I'm sure your Honor has

O5GHFedO

1    focused in on that; it's paragraph 31 — that goes to

2    knowledge.  And tellingly, that paragraph switches from

3    discussion of Mr. Ehrlich in the singular to defendants in the

4    plural because these allegations really don't go to

5    Mr. Ehrlich's knowledge here, as they must.

6            But even, again, sort of looking at this in the light

7    most favorable to the FTC, they rest their hat on knowledge on

8    two things:  They rest it on this email exchange they allege

9    occurred in November of 2021 between MCB Bank and Voyager

10   individuals, and they rest this knowledge on a post-bankruptcy

11   letter issued by the FDIC.

12           I think a really striking thing and a point we sort of

13   didn't focus in on in our brief is that that email

14   communication, even by the FTC's own admissions in the

15   complaint, took place in November 2021.  So how the FTC

16   purports to establish knowledge on behalf of Mr. Ehrlich based

17   on an email communication that they haven't specified he

18   participated in or received in any way from November 2021, when

19   several of the alleged statements here are before that time, is

20   perplexing to me.

21           At heart, this complaint really alleges that there are

22   four statements that are misleading: a November 2019 blog; a

23   May 2020 tweet, a single tweet; a May 2022 blog entry; and a

24   letter that was issued under Mr. Ehrlich's name on June 14,

25   2022.  So even if the FTC has made out knowledge as to those

O5GHFedO

1    later statements based on that single email chain that they

2    reference in just a few sentences in the complaint, which we

3    argue they have not, they haven't even set forth any basis for

4    the required knowledge to establish individual liability for

5    those earlier statements, the November 2019 blog and the

6    May 2020 tweet.  That was a point, a timing point, that we

7    hadn't focused on in our briefing that I wanted to raise for

8    your Honor.

9              In addition, both sides have discussed at length this

10   issue about availability of monetary relief under the GLB Act.

11   I think our position is set forth well in our briefing, and I

12   don't want to belabor that issue here.  I suspect your Honor is

13   thinking about how would your decision here on that issue fit

14   into Judge Rakoff's decision in the *RCG* case, and my answer to

15   that ── and I know your Honor raised that in our earlier

16   conference ── and my answer to that is, looking at that

17   decision in *RCG*, and with all respect to Judge Rakoff, who I've

18   been in many appearances in front of and respect with the

19   utmost respect, but I don't think he had the benefit of all the

20   arguments in connection with that decision.  His decision

21   related to this issue is really short, short and sweet.  He

22   doesn't get into all of the details.  Again, it is just a few

23   sentences, and I think ── and he recognizes that his decision

24   on this is really a matter of first impression in the country.

25   So we would invite your Honor to take a fresh look at this

O5GHFedO

1    particular issue.

2            Under the *AMG* case, the FTC was limited in its ability

3    to seek monetary relief, and now they are since utilizing this

4    concocted scenario under the GLB Act to seek monetary relief.

5    That have really what is a convoluted reading of the statute to

6    get to their final conclusion that monetary relief is available

7    under the GLB Act.  We disagree very strongly with that

8    conclusion.  We think it is contrary to many other statutes

9    where Congress explicitly gave the FTC Act the ability to seek

10   monetary relief and where they did not do so here.  And we

11   think that is telling, and the Court should not — certainly

12   should decide that the FTC — the FTC is not able to seek

13   monetary relief under the GLB Act.

14           MR. GLASSMAN:  This is mark Glassman for the

15   defendants, and obviously, we have a response to those points.

16           I would like to start just with the sort of key point

17   here that the defendants are making in trying to sort of

18   misdirect the argument as to individual liability and claims

19   that are made.  This is a point that I think we really think

20   needs to be emphasized.  What the FTC alleges in this case is

21   set forth in its counts.  We allege that Voyager made false and

22   misleading claims that consumers' funds or deposits were

23   protected by the FDIC insurance, and we provide all the

24   necessary facts to plausibly reach that conclusion.  And what

25   we provide in the complaint are examples of the actual

O5GHFedO

1    advertisements and statements by Mr. Ehrlich, including ones

2    that he made himself as, counsel referenced, touting the safety

3    of the platform because of the FDIC insurance.  So I think it's

4    key to remember that.

5           One of those statements, in fact, the one that we've

6    quoted in the complaint, was made weeks before Voyager froze

7    consumers' funds and then subsequently declared bankruptcy.  We

8    think, looking at reasonable inferences, at a minimum, it is

9    certainly a plausible inference that Mr. Ehrlich couldn't have

10   made that statement at that time without knowing that it was

11   false.

12          As to the other facts that we've alleged, we've

13   alleged more facts than defense counsel would certainly allow

14   that go to Mr. Ehrlich's liability.  They fall generally into

15   three categories if you look the complaint:  There are facts

16   that relate to allegations about conduct individual to

17   Mr. Ehrlich, and those are in paragraphs 11, 12, 24, and 32.

18   We make allegations about conduct by defendants, plural, which

19   includes Mr. Ehrlich, and there are numerous allegations there,

20   including 2, 3, 4, 28, 31, 33, 39, 40, and 42.  And then there

21   are allegations that relate simply to Voyager.  And in fact,

22   the FTC alleges that Mr. Ehrlich is also liable for statements

23   made by Voyager by virtue of his individual liability and his

24   participation and authority to control.  So we have all of

25   those allegations, contrary to sort of the presentation that

O5GHFedO

1   it's really just one.

2              The test for whether or not something is deceptive

3   under the FTC Act is long-standing.  It's a representation,

4   omission, or practice that's likely to mislead consumers acting

5   reasonably under the circumstances and that is material.

6   Again, the complaint alleges that consumers, acting reasonably

7   under the circumstances, understood Mr. Ehrlich's and Voyager's

8   claims to mean that their funds or deposits were FDIC insured.

9   We think it's important to keep a focus on what the claims

10  were, funds or deposits are FDIC insured.

11             Contrary to the vast weight of the briefing that we've

12  seen from the defendants, the law ⸺ instead of the law of

13  deception, Voyager and the defendants are urging the Court to

14  adopt the sort of literal falsity standard, which simply

15  doesn't apply.  It's been rejected over and over again by

16  courts, including courts in the Second Circuit, and those

17  courts have held, as we've said in our briefing, that it's

18  well-established that advertising need not be literally false

19  in order to fall within the prescription of the act.  And an

20  advertisement as a whole may be completely misleading, even

21  though every sentence separately considered is literally true.

22  We don't think these sentences are literally true, but even if

23  they were, that wouldn't be what the test is.

24             The same court held there are obvious methods of

25  employing a true statement so as to convey a false impression.

O5GHFedO

1    The claim the FTC is asserting here is that the defendants told

2    consumers their funds and deposits were safe on the platform,

3    and there are plenty of allegations that talk about that in our

4    complaint.  To point the Court to a couple of them, there are

5    the allegations that are in paragraph 2, there's paragraph 3,

6    and then there are a number of other paragraphs in the conduct

7    section that deal with the question of whether or not there's

8    safety.

9            On the question of Mr. Ehrlich's knowledge, it is true

10   that we allege that the defendants were informed by MCB that

11   the FDIC's claims could be potentially misleading, and that was

12   in November of 2021.  Again, it's a reasonable inference that

13   Mr. Ehrlich's participation in Voyager's corporate affairs and

14   his hands-on role, as we've alleged that he has, is probative

15   of his knowledge.  That's the *Moses* case that we've cited in

16   our briefing.

17           In addition to that, the FDIC sent a letter which was

18   included to Mr. Ehrlich.  That was after the bankruptcy, but it

19   was at a time when Voyager was still holding out plans to get

20   itself up and running again.  And significantly, even after

21   bankruptcy, Voyager was still making the claims about FDIC

22   insurance.

23           And then, finally, there's the one that we've all

24   talked about.  Mr. Ehrlich himself made statements that Voyager

25   was well-capitalized and positioned to weather the bear market,

O5GHFedO

1    and the consumers money was as safe with us as at a bank

2    because of FDIC insurance.  That's the statement in

3    paragraph 32.  And he did that —— he didn't just make the

4    statement.  He made it, as we alleged, in 2022, two weeks

5    before Voyager froze consumers' funds and declared bankruptcy.

6        *Iqbal* holds that a claim has facial plausibility when

7    the plaintiff alleges facts that allow the reasonable inference

8    that the defendant is liable for the misconduct.  Clearly,

9    Mr. Ehrlich had knowledge that the statement was made.  He made

10    it.  That doesn't require any inference.  But he also had

11    knowledge that the statement would encourage consumers to keep

12    their funds on Voyager during the crypto bear market, and it

13    was a crypto bear market, not a cash bear market.  As the FTC

14    alleged in paragraph 19, the total collapse of cryptocurrencies

15    and stablecoins and popular cryptocurrency exchanges were

16    happening in 2022, and that's important to remember because,

17    again, in *Five-Star Auto*, which both parties have cited in this

18    case, the court points out that we look at the context of the

19    statement when evaluating its effect on a reasonable consumer

20    acting under the circumstances, and that was the context.

21        So not only is it reasonable to infer that

22    Mr. Ehrlich, the CEO of Voyager, would have known two weeks

23    before Voyager froze all consumer accounts and three weeks

24    before it declared bankruptcy that Voyager was not as safe as a

25    bank because of FDIC insurance and not positioned to weather

O5GHFedO

1    the bear market, it's unreasonable to infer otherwise, we

2    think.  But even if we did infer otherwise, it would require us

3    to conclude that Mr. Ehrlich was recklessly indifferent.  How

4    could he be otherwise to not know that?  And that would still

5    meet the requirements for knowledge in this case.

6         So we think that it's clear the allegations are

7    sufficient for knowledge.  And again, the allegations are

8    examples.  We're not at the evidence stage here; we're at the

9    pleading stage.

10         In terms of other statements, I know that the

11    defendants have talked about the relief defendant, and for that

12    I would like to turn the discussion to Sanya Shahrasbi, if

13    that's acceptable to the Court, and she can address some of

14    those arguments.

15         THE COURT:  Thank you.

16         Yes, if there's something you'd like to add to your

17    briefing or to respond specifically to defendants' comments,

18    I'm happy to hear from you.

19         MS. SHAHRASBI:  Thank you, your Honor.  This is Sanya

20    Shahrasbi.

21         I'll just address defendants' claims about Francine

22    Ehrlich being relief defendant.

23         So to make a claim against relief defendant, the

24    complaint need only allege facts plausible on the face of the

25    complaint to show that the person received ill-gotten funds and

O5GHFedO

1    does not have a legitimate claim to those funds, and our

2    complaint does stress that.   In paragraph 12, we allege that

3    Mr. Ehrlich transferred millions of dollars to Francine Ehrlich

4    from the sale of Voyager stock, and then we also allege that he

5    sold a home at a discount to a trust in his wife's name.

6            So we've alleged that these funds can be directly

7    traced to defendants' deceptive acts or practices.   And

8    importantly, Ms. Ehrlich does not dispute that she has no

9    legitimate claims to those funds.   In the complaint, we've

10   alleged details of Mr. Ehrlich's deceptive conduct, so the

11   genesis or the creation of these ill-gotten gains, in

12   paragraphs 24 through 42; and then we've alleged that

13   Ms. Ehrlich received those funds derived from the unlawful

14   conduct in paragraph 12 and then 58 through 60.

15           We've cited case law, *FTC v. LeanSpa,* where the facts

16   there are quite similar to the ones here.   The complaint was

17   sufficient when there was an allegation of a spousal

18   relationship where the defendant was the owner of the entity

19   and the complaint described the deceptive conduct of the

20   defendant and then stated —— alleged that the spousal relief

21   defendant received funds or otherwise benefited from the

22   defendant's ill-gotten gains.

23           So there is no need at the pleading stage to provide

24   detailed dates or amounts of these alleged transfers, and we've

25   fully briefed that in our briefing.

O5GHFedO

1          THE COURT:  Very good.  Thank you.

2          Counsel for defendants, yes, do you want to respond to

3    any of those comments?  I'm happy to give you the opportunity

4    to do so.

5          MS. KRISSOFF:  Thank you, your Honor.

6          Mr. Glassman jumped in, and I was —— I guess I took

7    too long of a breath there.  I should refrain from doing that,

8    but I do want to respond particularly to some points he said.

9          We do have a fundamental dispute here regarding these

10   statements, as is very clear in the briefing.  I think that

11   boils down to the use of the term "USD," and the FTC is

12   implying or saying that somehow the use of USD is misleading.

13   That a reasonable customer would have misunderstood that to

14   mean U.S. dollar coin or some sort of cryptocurrency product.

15   I mean, that theory runs throughout the FTC's complaint, and I

16   think it's fatal to the FTC's complaint.

17         When I bought lunch today, I bought my soup, the

18   little thing pulled up on a little computer where I put my

19   credit card said "USD."  I was very clear I was paying in U.S.

20   dollars, not in cryptocurrency.  The idea that somehow the fact

21   Voyager used the term "USD," which is the standard abbreviation

22   for United States dollar, was somehow misleading or the fact

23   that Voyager would have marketing that includes a discussion of

24   both cash USD and cryptocurrency in the same marketing

25   materials was deceptive doesn't make sense.  That's like saying

O5GHFedO

1    McDonald's can't have an advertisement that contains discussion

2    about both chicken nuggets and hamburgers.  They are allowed to

3    talk about their different products in one particular marketing

4    piece of material.  That is not misleading.  So, obviously, we

5    have a fundamental disagreement on whether these could possibly

6    be misleading to a customer.

7            Beyond that, there's really this very significant

8    issue as to individual liability, and they have to show

9    authority to control and some sort of knowledge.  Again,

10   Mr. Glassman acknowledges it could be this reckless

11   indifference, it could be putting your head in the sand, but

12   the only thing they pointed to —— and Mr. Glassman went back to

13   that —— is that MCB email exchange and the FDIC letter that's

14   after the course of bankruptcy.  That's it.  There's nothing

15   else.  It cannot be that a single allegation regarding

16   Mr. Ehrlich's role in the company as CEO, which is

17   paragraph 11, this bare bones allegation about his role as CEO,

18   so he must have then been involved in the day-to-day operations

19   is sufficient.  They have to be something else, and it's just

20   not there.

21           It's particularly not there for the two of the four

22   statements in the complaint that are before November 2021,

23   which is the time of the MCB email exchange.  There is no

24   theory of personal liability for those Voyager statements.

25   There is no allegation that he was involved in the advertising

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5GHFedO

 1   in any way, that he reviewed it, that he acknowledged it, that

 2   he was on some marketing committee —— nothing.  None of that.

 3   And this is very different than a case like *Celsius* where those

 4   allegations were made and there were very different allegations

 5   in the complaint regarding the executive's involvement in the

 6   marketing materials here.  I think one of those executives had

 7   appeared in the marketing materials here.  That's just not

 8   present here, other than the single statement from Mr. Ehrlich

 9   from June of 2022.

10          Sort of listening to Mr. Glassman's argument on that

11   June statement, one, the defendants feel very strongly that

12   that statement is accurate.  We ask your Honor to go back and

13   read that.  I'm hard pressed to think about how those

14   statements at issue, the particular statements about FDIC

15   insurance, could be viewed as inaccurate.

16          And second of all, it cannot be that the ultimate

17   bankruptcy of the company —— Mr. Glassman essentially argued

18   because there was a bankruptcy several weeks later, Mr. Ehrlich

19   must have known at that time that his statements were false and

20   misleading.  That's not logical, right?  There could be a

21   tornado in 20 minutes.  I don't know right now that that

22   tornado is coming unless I have a tornado warning, unless

23   there's an alert on my phone, unless The Weather Channel tells

24   me that.  It cannot just be because the tornado comes that I

25   should have known it was coming, and then my statements that

O5GHFedO

1    said it was sunny outside were not accurate.  That's just not

2    correct.

3           Going also to the statements, I think the complaint

4    here really focuses on FDIC insurance.  The allegations here

5    are that the statements that Voyager made about the

6    availability of FDIC insurance were incorrect.  The FTC had an

7    opportunity to amend.  They've been investigating this case for

8    years, and we have made clear to them —— we have all of the

9    inadequacies in the complaint.  They had an opportunity to fix

10   those inadequacies before they filed it.  They had an

11   opportunity to amend after we filed our motion.  They did not

12   do so.

13          But now they are pivoting and arguing that somehow

14   this general statement about the safety of the platform, the

15   general —— sort of what are termed in the securities law world

16   this puffery are what they're concerned about.  That is not

17   what the allegations are in the complaint.  The allegations in

18   the complaint are that the Voyager statements regarding the

19   availability of FDIC insurance are misleading.  And sort of to

20   try to shift this now, when they've had every opportunity to

21   shore up their complaint, I think, is not appropriate.

22          Regarding the relief defendant issue, again, I

23   appreciate the law on this, and FTC has again recited the law

24   on this, but there has to be some sort of facts underneath the

25   law.  The allegations in the complaint cannot just be a

O5GHFedO

1    recitation of the legal standard.  The money that is alleged to

2    go to Ms. Ehrlich is proceeds from stock sale and proceeds from

3    the sale of the personal home.  There is no connection, no

4    factual connection, of how those — how that money could

5    possibly be tied to the misleading allegation — the allegedly

6    misleading allegations in the complaint.

7         This case is very different than a case like *LeanSpa*

8    where there was at least a theory, a theory of how the money

9    that the wife in that case received was ill-gotten gains.

10   Here, there is no theory.  They're simply saying she got money;

11   therefore, it must have been the proceeds of some ill-gotten

12   gains.  But they have failed to connect up steps one, two,

13   three, and four.

14        The inclusion of Ms. Ehrlich here is nothing more than

15   an attempt to pressure Mr. Ehrlich to settle this case, to

16   resolve this case, and to really — it's really, frankly,

17   extortionist.  Without more here, without more allegations

18   regarding even at least a bare theory of why the money she

19   received legitimately, for instance, from the sale of their

20   personal home, is ill-gotten gains.  I just think those are

21   inadequate.  We all know what the legal standards are.  The

22   issue is there are no factual allegations, even a sentence or

23   two, underlying those legal points.

24        The relief defendant claim, the only facts in the case

25   underlying the relief defendant claim are in paragraph 12.  It

O5GHFedO

1  is three sentences long.  There is one sentence about the

2  transfers to her, and I agree it sets forth transfers to

3  Mrs. Ehrlich.  But the complaint does not explain in any way

4  why those are improper or why those were somehow the proceeds

5  of ill-gotten gains.  And for that reason, I think there is

6  really — the Court has little choice but to dismiss her from

7  this case.

8          THE COURT:  Good.  Thank you very much, counsel.

9          Thank you all very much for your arguments.  I am

10  going to ask you, if you would, to again please place your

11  phones on mute.  I'm going to rule on this motion orally.  I'm

12  going to do that now.

13          And for the reasons that follow, the Ehrlich

14  defendants' motion to dismiss is denied.  I'll start with.

15          I.  Background

16          I assume the parties' familiarity with the underlying

17  facts in this case.

18          The Ehrlich defendants move to dismiss and to strike

19  on two grounds, attacking both the merits of the FTC claims and

20  the relief that the FTC seeks.  Defendants first argue that the

21  FTC fails to state a claim under Section 5 of the Federal Trade

22  Commission Act (the "FTC Act") or Section 521(a)(2) of the

23  Gramm-Leach-Bliley Act (the "GLB Act").

24          Regarding the FTC Act claim, the Ehrlich defendants

25  argue that "the FTC has not plausibly alleged that the sole

O5GHFedO

1   statement attributed to Mr. Ehrlich was likely to mislead

2   consumers acting reasonably under the circumstances." Dkt. No.

3   49 at 2. Nor was this statement, in their view, "a false,

4   fictitious, or fraudulent statement" under the GLB Act. *Id.*

5   They also argue that the FTC has failed to plausibly allege "a

6   basis for imposing individual liability on Mrs. Ehrlich"

7   because the FTC has, in their view, failed to "link" her funds

8   to any allegedly unlawful practices of the defendants. *Id.*

9       Second, the Ehrlich defendants argue that "the FTC

10  overreaches on the relief it seeks." *Id.* For monetary relief,

11  they argue that "the FTC has not alleged the necessary

12  violation of a trade regulation rule required under Section 19

13  of the FTC Act." *Id.* And in the case of injunctive relief,

14  they argue that the FTC has failed to "plausibly allege that

15  violations of either act are ongoing or imminent" because

16  "Voyager is in bankruptcy proceedings and is winding down its

17  operations, Mr. Ehrlich is no longer CEO, and there is no

18  allegation that Mr. Ehrlich is involved in a similar business

19  venture that might make similar representations about FDIC

20  insurance." *Id.*

21      The Ehrlich defendants bring this motion under Rules

22  12(b)(6) and Rule 12(f), arguing that the FTC has failed to

23  state a claim and that its requests for injunctive and monetary

24  relief should be stricken from the complaint under Rule 12(f).

25  *Id.* at 16-19.

O5GHFedO

1        II.  Legal Standard

2        A.  Rule 12(b)(6):  Failure to State a Claim

3        "To survive a motion to dismiss, a complaint must

4   contain sufficient factual matter, accepted as true, to 'state

5   a claim to relief that is plausible on its face.'"  *Ashcroft v.*

6   *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

7   *Twombly,* 550 U.S. 544, 570 (2007)).  "A claim has facial

8   plausibility when the plaintiff pleads factual content that

9   allows the court to draw the reasonable inference that the

10  defendant is liable for the misconduct alleged."  *Id.* (citing

11  *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to

12  allege facts that are consistent with liability; the complaint

13  must "nudge" claims "across the line from conceivable to

14  plausible."  *Twombly*, 550 U.S. at 570.  "To survive dismissal,

15  the plaintiff must provide the grounds upon which his claim

16  rests through factual allegations sufficient 'to raise a right

17  to relief above the speculative level.'"  *ATSI Commc'ns,*

18  *Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

19  (quoting *Twombly*, 550 U.S. at 555).

20       Determining whether a complaint states a plausible

21  claim is a "context-specific task that requires the reviewing

22  court to draw on its judicial experience and common sense."

23  *Iqbal*, 556 U.S. at 679.  The court must accept all facts

24  alleged in the complaint as true and draw all reasonable

25  inferences in the plaintiff's favor.  *Burch v. Pioneer Credit*

O5GHFedO

*Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

However, "threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not

suffice."  A complaint must therefore contain more than "naked

assertions devoid of further factual enhancement."  Pleadings

that contain "no more than conclusions . . . are not entitled

to the assumption of truth" otherwise applicable to complaints

in the context of motions to dismiss.

          That was a citation from *DeJesus v. HF Mgmt. Servs.,*

*LLC,* 726 F.3d 85, 87-88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S.

at 678-79).  Thus, a complaint that offers "labels and

conclusions" or "naked assertions" without "further factual

enhancement" will not survive a motion to dismiss.  *Iqbal*, 556

U.S. at 678.  "A court's task" on a motion to dismiss "is to

assess the legal feasibility of the complaint; it is not to

assess the weight of the evidence that might be offered on

either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d

Cir. 2020).

          "The purpose of Rule 12(b)(6) is to test, in a

streamlined fashion, the formal sufficiency of the plaintiff's

statement of a claim for relief without resolving a contest

regarding its substantive merits.  The rule thus assesses the

legal feasibility of the complaint, but does not weigh the

evidence that might be offered to support it?" *Glob. Network*

*Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir.

O5GHFedO

2006) (emphasis in original).  On a motion to dismiss, a court

must generally "limit itself to the facts stated in the

complaint."  *Field Day, LLC v. Cnty. of Suffolk,* 463 F.3d 167,

192 (2d Cir. 2006).  But a court may consider "any 'written

instrument' . . . attached to [the complaint] as 'an exhibit'

or . . . incorporated in it by reference."  *Lynch v. City of*

*New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ.

P. 10(c)).  A court may also consider a document "solely

relied" on by the plaintiff if it "is integral to the

complaint."  *Id.* (internal quotation marks and citation

omitted).  A document is "integral to the complaint" if the

complaint "relies heavily" on the document's "terms and

effect."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d

Cir. 2016).

     B.  Rule 12(f):  Motion to Strike

          Rule 12(f) allows a court to "strike from a pleading

an insufficient defense or any redundant, immaterial,

impertinent, or scandalous matter," either "on its own" under

Rule 12(f)(1) or "on motion made by a party" under Rule

12(f)(2).  Fed. R. Civ. P. 12(f).  "Rule 12(f) should be

construed strictly against striking portions of the pleadings

on the grounds of immateriality, and if the motion is granted

at all, the complaint should be pruned with care."  *Lipsky v.*

*Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976).

          III.  Discussion

O5GHFedO

1                A.    The Motion to Dismiss

2          Because the FTC adequately states a claim under both

3     Section 5(a) of the FTC Act and Section 521(a)(2) of the GLB

4     Act, defendants' motion to dismiss is denied.

5                1.    The Pleading Standard

6          At the outset, the parties dispute whether Rule 8 or

7     Rule 9(b) applies to claims brought under Section 5 of the FTC

8     Act and Section 521 of the GLB Act.  Rule 8(a) requires only "a

9     short and plain statement of the claim showing that the pleader

10    is entitled to relief," whereas Rule 9(b) requires that in

11    "alleging fraud or mistake, a party must state with

12    particularity the circumstances constituting fraud or mistake."

13    Fed. Rs. Civ. P. 8(a), 9(b).

14         As Judge Cote recently observed in *FTC v. Celsius*

15    *Network, Inc.*, "the Second Circuit has not directly addressed"

16    what pleading standard applies in Section 5 cases, but its

17    decision in *Pelman v. McDonald's Corp.* supports the reading

18    that Rule 8(a) applies because "the FTC need not prove

19    scienter, reliance, or injury to establish a §5 violation."

20    2023 WL 8603064, at *3 (S.D.N.Y. Dec. 12, 2023) (citing *Pelman*,

21    396 F.3d 508, 511 (2d Cir. 2005); *FTC v. Moses*, 913 F.3d 297,

22    306 (2d Cir. 2019)); *see also id.* ("Courts in this district

23    have thus consistently held that the FTC need only meet the

24    bare-bones pleading requirements of Rule 8(a)." (collecting

25    cases)).

O5GHFedO

1          The same is true of the GLB Act:  Pleading a violation

2     of Section 521 does not require allegations of "fraud or

3     mistake," or scienter.  Compare 15 U.S.C. §6821(a) (lack of

4     scienter for civil violations of the GLB Act) with 15 U.S.C.

5     §6823(a) (criminal provision of the GLB Act providing that

6     "whoever knowingly and intentionally violates, or knowingly and

7     intentionally attempts to violate, section 6821 of this title

8     shall be fined . . . or imprisoned . . . or both").  Nor does

9     Section 521 require proof of reliance or injury.  *See* 15 U.S.C.

10    §6821(a) ("It shall be a violation . . . for any person to

11    obtain or attempt to obtain . . . customer information of a

12    financial institution relating to another person . . . by

13    making a false, fictitious, or fraudulent statement or

14    representation to a customer of a financial institution."

15    (emphasis added)).

16         Because the FTC need neither allege "fraud or

17    mistake," nor "prove the same elements as common-law fraud" to

18    establish violations of either Section 5 of the FTC Act or

19    Section 521 of the GLB Act, Rule 8(a) applies.  *See* Fed. Rs.

20    Civ. P. 8(a), 9(b); *see also Celsius*, 2023 WL 8603064, at *3

21    (concluding the same); *cf. Pelman,* 396 F.3d at 511 (applying

22    this analysis to the New York Consumer Protection Act).

23         2.  The FTC Act Claim

24         Section 5(a) of the FTC Act prohibits "unfair or

25    deceptive acts or practices in or affecting commerce."  15

O5GHFedO

U.S.C. §45(a)(1). "The FTC must show three elements to prove a

deceptive act or practice in violation of §5(a)(1): '[1] a

representation, omission, or practice, that [2] is likely to

mislead consumers acting reasonably under the circumstances,

and [3], the representation, omission, or practice is

material.'" *FTC v. Verity International, Ltd.*, 443 F.3d 48, 63

(2d Cir. 2006) (quoting *FTC v. Moses*, 913 F.3d 297, 306 (2d

Cir. 2019) (brackets in original)); *see also Murray Space Shoe*

*Corp. v. FTC,* 304 F.2d 270, 272 (2d Cir. 1962) ("In deciding

whether petitioner's advertising was false and misleading, we

are not to look to technical interpretation of each phrase, but

must look to the overall impression these circulars are likely

to make on the buying public."). "The deception need not be

made with intent to deceive; it is enough that the

representations or practices were likely to mislead consumers

acting reasonably." *Moses*, 913 F.3d at 306. "A claim is

considered material if it involves information important to

consumers and, hence, is likely to affect their choice of or

conduct regarding a product." *FTC v. Med. Billers Network,*

*Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008) (internal

quotation marks and citations omitted). And "express

representations that are shown to be false are presumed

material." *Id.*

        "An individual may be held liable under the FTCA for a

corporation's deceptive acts or practices 'if, with knowledge

O5GHFedO

1   of the deceptive nature of the scheme, he either participates

2   directly in the practices or acts or has authority to control

3   them.'" *Moses*, 913 F.3d at 306 (quoting *FTC v. LeadClick*

4   *Media, LLC*, 838 F.3d 158, 169 (2d Cir. 2016)). "To prevail on

5   the issue, the FTC must therefore establish that

6        "The corporate practices were misrepresentations or

7   omissions of a kind usually relied on by reasonably prudent

8   persons and that consumer injury resulted.  Once corporate

9   liability is established, the FTC must show that the individual

10  defendants participated directly in the practices or acts or

11  had authority to control them.  Authority to control the

12  company can be evidenced by active involvement in business

13  affairs and the making of corporate policy, including assuming

14  the duties of a corporate officer."

15       *Id*. at 306-07 (citations omitted).  This does not

16  "require that a defendant create deceptive content to be

17  liable" as an individual defendant.  *LeadClick*, 838 F.3d at 168

18  (emphasis in original).  Instead, a "defendant directly

19  participates in deception when it engages in deceptive acts or

20  practices that are injurious to customers with at least some

21  knowledge of the deception." *Id.* at 169-70.

22       On authority to control, "the dispositive issue" is

23  not whether the individual defendant "exercised authority to

24  control the corporate defendants' conduct, [but] whether he

25  possessed authority to control it." *Moses*, 913 F.3d at 308

O5GHFedO

(emphases in original).  Courts have found that the complaint

sufficiently alleged "authority to control" where the

individual defendants founded the company and managed the

corporate defendants, *see id.*, and where individual defendants

were alleged to have held senior positions, overseen a wide

range of functions there, and were signatories on the accounts.

*See FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 473 (S.D.N.Y.

2014).

        The FTC is also "required to establish the defendants

had or should have had knowledge or awareness of the

misrepresentations." *Moses*, 913 F.3d at 307 (internal

quotation marks and citation omitted).  But the FTC need not

establish that an individual defendant had "actual and explicit

knowledge of the particular deception at issue." *Id.*  Rather,

"knowledge may be established by showing that the individual

defendant had actual knowledge of the deceptive conduct, or was

recklessly indifferent to its deceptiveness, or had an

awareness of a high probability of deceptiveness and

intentionally avoided learning of the truth." *Id.* (cleaned

up).  And "'the degree of participation in business affairs' is

a relevant factor in determining whether [the individual

defendant] had knowledge of the corporate defendants' wrongful

actions." *Id.* at 309 (citation omitted); *see also id.* (finding

that "that factor [was] dispositive" where the individual

defendant "served as the corporate defendants' co-director and

O5GHFedO

1 general manager" and, "in performing that role, was intimately

2 involved with the unlawful activities at issue").  For example,

3 being "aware of consumer complaints against the corporate

4 defendants" can contribute to a finding that the individual

5 defendant was at least aware of a high probability of fraud.

6 *See id.* at 308.

7          The complaint adequately states a claim against the

8 Ehrlich defendants under the FTC Act.  It alleges that

9 Mr. Ehrlich was the co-founder and CEO of Voyager Digital, LLC,

10 Voyager Digital Holdings, Inc., and Voyager Digital Ltd.

11 (collectively, the "Corporate Defendants") since their

12 inception.  Dkt. No. 1 ("Complaint")  11.  Mr. Ehrlich has been

13 involved in Voyager's "day-to-day operations," and he himself

14 has "communicated with customers about purported FDIC insurance

15 coverage at Voyager."  *Id.*  The FTC contends that Mr. Ehrlich

16 "has formulated, directed, controlled, had the authority to

17 control, or participated in the acts and practices" of the

18 corporate defendants.  *Id.*  For example, Mr. Ehrlich allegedly

19 "encouraged consumers to 'ditch [their] bank' and use Voyager's

20 debit card."  *Id.* 24.  And on June 14, 2022, he allegedly sent

21 a letter to consumers "stressing that . . . Voyager goes the

22 'extra mile to be transparent . . . ' And was 'well-capitalized

23 and positioned to weather the bear market.'"  *Id.* 32.  He

24 concluded by, in his words, "reminding everyone that USD is

25 held by our banking partner, Metropolitan Commercial Bank,

O5GHFedO

which is FDIC insured.  The cash you hold with Voyager is

protected up to $250,000 — which means it's as safe with us as

at a bank."  *Id.*

        The FTC contends that Defendants made these statements

while aware that neither Voyager itself nor its cryptocurrency

were FDIC-insured and that its marketing could be misleading to

a reasonable consumer.  The FTC alleges that all of the

defendants, including Mr. Ehrlich, "were well aware" that

neither Voyager nor its cryptocurrency were backed up by the

FDIC.  *Id.*  31.  The FTC cites to a November 2021 email

exchange between defendants and Voyager's partner bank, MCB, in

which "MCB asked Voyager to change how it described FDIC

insurance in the terms and conditions for Voyager's debit card,

because MCB found the statement that funds in the debit card

account would be FDIC insured as 'potentially misleading.'"

*Id.*  The MCB representative allegedly told the defendants that

"a reasonable consumer could conclude that his USDC [USD Coin]

held with Voyager is FDIC-insured."  *Id.*  And Defendants

allegedly "did not revise or take down the . . . FDIC

representations in consumer-facing marketing materials,"

notwithstanding this warning.  *Id.*  The FTC adds that "many"

consumers "noted that they put their savings into Voyager

because they believed their deposits were FDIC insured."  *Id.*

34; *see also id.* 36-38 (describing many such consumer

accounts).

O5GHFedO

1          Last, the FTC alleges that "on July 28, 2022, the FDIC

2     and Federal Reserve sent Defendants a letter telling them to

3     cease and desist from making the following misrepresentations:

4     (1) Voyager is insured by the FDIC; (2) consumers who invested

5     with the Voyager cryptocurrency platform would receive FDIC

6     insurance coverage for all deposits provided to, held by, on,

7     or with Voyager, without reference to the insured depository

8     institution account; or (3) the FDIC would insure consumers

9     against the failure of Voyager itself." *Id*. par. 39.

10    Nonetheless, Defendants allegedly continued advertising that

11    consumers' cash deposits with Voyager were "eligible for FDIC

12    deposit insurance." *Id*. par. 40.

13          These allegations suffice to state a claim under

14    Section 5.

15          First, the FTC has plausibly alleged material

16    representations likely to mislead a reasonable consumer. *See*

17    *Verity*, 443 F.3d at 63. These include Mr. Ehrlich's own June

18    14, 2022 letter, and Voyager's statements about how the "USD

19    held with Voyager is now FDIC-insured" up to $250,000, *see*

20    Complaint par. 25-28; and that as a result, consumers' "cash is

21    safe with us" and "as safe with us as at a bank." *Id*. par. 28.

22    The USD Coin stored on Voyager's platform was not FDIC-insured,

23    nor was Voyager itself. *Id*. par. 29. And the FTC alleges that

24    FDIC insurance did not "protect consumers' U.S. dollar deposits

25    against Voyager's failure." *Id*.

O5GHFedO

1          The Ehrlich Defendants are correct in observing that

2     neither Voyager nor Mr. Ehrlich directly claimed that

3     consumers' cryptocurrency assets were insured, nor that their

4     USD Coin was itself insured.  But as the Second Circuit has

5     stated:  "It is enough that the representations or practices

6     were likely to mislead consumers acting reasonably." *Verity*

7     *International,* 443 F.3d at 63; *see also Moses*, 913 F.3d at 306

8     (same).  Defendants' representations were "misrepresentations

9     or omissions of a kind usually relied on by reasonably prudent

10    persons," and consumer injury resulted.  *See Moses*, 913 F.3d at

11    307.  The representations that, for example, customers'

12    deposits with Voyager were "as safe with us as at a bank,"

13    Complaint par. 28, were likely to mislead a reasonable

14    consumer, as pleaded.  Indeed, the complaint alleges that MCB

15    specifically warned Voyager that its statements were

16    "potentially misleading."  Complaint par. 31.

17          Second, the FTC has adequately pleaded that

18    Mr. Ehrlich had at least "some knowledge" of these

19    representations, participated directly in them, or had

20    authority to control them.  *See Moses*, 913 F.3d at 306-07.  The

21    FTC alleges that Mr. Ehrlich was not just the co-founder and

22    CEO of Voyager; he was also involved in Voyager's "day-to-day

23    operations," and he personally "communicated with customers

24    about purported FDIC insurance coverage at Voyager."  Complaint

25    par. 11.  The FTC need not allege that he actually exercised

O5GHFedO

1     any authority in shaping Voyager's statements; that he

2     possessed the authority to control the corporate defendants'

3     conduct is enough.  *See Moses*, 913 F.3d at 308; *see also Tax*

4     *Club*, 994 F. Supp. 2d at 473 (finding that the complaint

5     sufficiently alleged that individual defendants had the

6     authority to control corporate defendants where the former

7     allegedly held senior positions, oversaw the company, and were

8     signatories on the accounts).

9            Additionally, Mr. Ehrlich himself authored one of the

10    misleading representations, and he personally and repeatedly

11    reassured consumers of Voyager's safety.  *See* Complaint par.

12    24, 32.  The FTC has plausibly alleged that Mr. Ehrlich was

13    actively involved in Voyager's business affairs as one of its

14    C-suite corporate officers.  This high "degree of participation

15    in business affairs" suggests that Mr. Ehrlich likely had

16    knowledge of the corporate defendants' conduct, as alleged.

17    *See Moses*, 913 F.3d at 306-07, 309; *see also Tax Club*, 994 F.

18    Supp. 2d at 473.

19           As for the email sent by MCB alerting defendants to

20    the likelihood of consumer confusion, the Ehrlich defendants

21    assert that "there are no allegations that Mr. Ehrlich received

22    this email or corresponded with MCB . . . and thus this

23    allegation has no relevance to his knowledge."  Dkt. No. 49 at

24    10.  But the complaint says the email was "between defendants

25    and . . . MCB."  Complaint par. 31 (emphasis added).  Mr.

O5GHFedO

1   Ehrlich is listed as one of the defendants, and drawing all

2   reasonable inferences in the FTC's favor, the Court infers that

3   this email chain was between all of the defendants —— including

4   Mr. Ehrlich —— and MCB.  *See Burch*, 551 F.3d at 124.  Even

5   without the email, the FTC has adequately pleaded that Mr.

6   Ehrlich —— even if lacking actual knowledge of the corporate

7   defendants' conduct —— "was recklessly indifferent to its

8   deceptiveness, or had an awareness of a high probability of

9   deceptiveness and intentionally avoided learning of the truth."

10  *See Moses*, 913 F.3d at 307.

11          3.  The GLB Act Claim

12          The FTC also adequately states a claim for relief

13  under the GLB Act.  Section 521(a)(2) of the GLB Act prohibits

14  any person from "obtaining or attempting to obtain . . .

15  customer information of a financial institution relating to

16  another person . . . by making a false, fictitious, or

17  fraudulent statement or representation to a customer of a

18  financial institution . . . ."  15 U.S.C. §6821.  "Customer" is

19  statutorily defined as "any person . . . to whom the financial

20  institution provides a product or service . . . ."  15 U.S.C.

21  §6827(1).

22          "Customer information of a financial institution" is

23  defined as "any information maintained by or for a financial

24  institution which is derived from the relationship between the

25  financial institution and a customer of the financial

O5GHFedO

institution and is identified with the customer." 15 U.S.C.

§6827(2). And Section 522 of the GLB Act states that

"compliance with [Section 521] shall be enforced by the Federal

Trade Commission in the same manner and with the same power and

authority as the Commission has under the Fair Debt Collection

Practices Act [the 'FDCPA'] to enforce compliance with such

Act." 15 U.S.C. §6822(a). The FDCPA, in turn, provides that

"a violation of this subchapter shall be deemed an unfair or

deceptive act or practice in violation of" the FTC Act, and

that "all of the functions and powers of the Federal Trade

Commission under the Federal Trade Commission Act are available

to the Federal Trade Commission to enforce compliance" with the

FDCPA "in the same manner as if the violation had been a

violation of a Federal Trade Commission trade regulation rule."

15 U.S.C. §1692(a).

        The FTC argues that the language of the GLB Act

"expressly authorizes the FTC to enforce it as a rule

violation," citing to Judge Rakoff's reasoning in *FTC v. RCG*

*Advances, LLC*, adopted by Judge Cote in *FTC v. Celsius Network*

*Inc. See RCG Advances,* 2023 WL 6281138, at *10 (S.D.N.Y. Sept.

27, 2023); *Celsius*, 2023 WL 8603064, at *5 (S.D.N.Y. Dec. 12,

2023).

        In short, the argument is that because (1) the GLB Act

may be enforced by the FTC "in the same manner and with the

same power and authority" as the FTC has under the FDCPA; and

O5GHFedO

(2) the FDCPA authorizes the FTC to enforce compliance with the FDCPA "in the same manner as if the violation had been a violation of a Federal Trade Commission trade regulation rule," the GLB Act may also be enforced "as if the violation had been a violation of a Federal Trade Commission trade regulation rule."  *See* Dkt. No. 57 at 21–22 (first quoting 15 U.S.C. §6822(a) and then quoting 15 U.S.C. §1692l(a)).

The Ehrlich defendants, in turn, contend that "from the text of the [GLB Act] statute, it is clear that something different is required to show a 'false, fictitious, or fraudulent statement,' than a statement that is 'likely to mislead consumers acting reasonably under the circumstances' as set forth in the FTC Act."  Dkt. No. 49 at 13.

So here, as in *RCG Advances*, "the dispute between the parties appears to be about the scope of the phrase 'false, fictitious, or fraudulent statement.'"  2023 WL 6281138, at *10.  The Court agrees with Judge Rakoff in reasoning that "the plain text of the statutory provision controls," and the Court "will not read a limitation . . . into the text."  *Id.*  Section 521 of the GLB Act, which "reaches 'false, fictitious, or fraudulent statement[s]' full stop, . . . certainly reaches statements that would be independently violative of Section 5 of the FTCA (as that provision only reaches misleading representations, omissions, or practices)."  *Id.*  Here, as in *RCG Advances*, the statements alleged in the complaint would be

O5GHFedO

1    "independently violative of Section 5 of the FTCA as material,

2    misleading misrepresentations."  *Id.*  Therefore, given that the

3    FTC alleges that defendants used these representations to

4    induce customers to make deposits with Voyager and to disclose

5    their bank account information to Voyager, the FTC has

6    adequately pleaded a violation of Section 521 of the GLB Act.

7    *See id.*Moreover, as for whether the Ehrlich defendants may be

8    individually liable for Voyager's alleged violations of Section

9    521, as Judge Rakoff wrote, this question "raises a threshold

10   issue that appears to be undecided in the Second Circuit:  What

11   standard applies?  . . .  The Second Circuit's holding in *Moses*

12   convinces this Court that the FTC is correct that the same

13   standards for imposing individual liability under Section 5 of

14   the FTCA apply to imposing individual liability under Section

15   521 of the GLB Act."  *Id.*  This is because, in *Moses*, "the

16   Second Circuit held that the individual liability standard

17   under Section 5 of the FTCA 'applies when the FTC brings an

18   action to enforce the FDCPA.'"  *Id.*  In reaching this

19   conclusion, the *Moses* Court first observed that the FDCPA

20   provides that "'a violation of [the FDCPA] shall be deemed an

21   unfair or deceptive act or practice in violation of' the FTCA

22   and is subject to enforcement 'in the same manner as if the

23   violation had been a violation of an [FTC] trade regulation

24   rule.'"  Moses, 913 F.3d at 307 (quoting 15 U.S.C. §16922(a)).

25   The Second Circuit reasoned:

O5GHFedO

1    "Violations of the FDCPA are deemed to be unfair or

2    deceptive acts or practices under the [FTC Act]."  The FTC,

3    then, is enforcing the FDCPA pursuant to its authority under

4    the FTCA.  And because the FTC can enforce compliance with the

5    FDCPA only by employing the FTCA, and "in the same manner as a

6    violation" of the FTCA, 15 U.S.C. §16922(a), it follows, we

7    conclude, that the FTCA individual liability standard applies.

8            *Id.* (internal citations omitted).

9            As Judge Rakoff reasoned, "that logic demands that the

10    same result obtain here" because "Section 522 of the GLB Act

11    states that the FTC can enforce compliance with Section 521 of

12    the GLB Act 'in the same manner and with the same power and

13    authority as the Commission has under the Fair Debt Collection

14    Practices Act . . . to enforce compliance with such Act.'"  *RCG*

15    *Advances*, 2023 WL 6281138 at *10 (quoting 15 U.S.C. §6822(a)).

16            "It follows, therefore, that the same standard for

17    imposing individual liability under the FDCPA should apply to

18    claims under the GLB Act, and the Second Circuit has already

19    held in *Moses* that the individual liability standard that

20    applies under the FDCPA is the same individual liability

21    standard that applies under Section 5 of the FTCA.  Therefore,

22    the Court applies the same individual liability standard that

23    applies under Section 5 of the FTCA to determine if [an

24    individual defendant] is individually liable for defendants'

25    violations of the GLB Act."

O5GHFedO

1      *Id*.; *see also Celsius*, 2023 WL 8603064, at *5

2      (adopting Judge Rakoff's reasoning in full and concluding that

3      "the FTC has adequately alleged that the individual defendants

4      had both the 'authority to control' and 'knowledge or

5      awareness' of the alleged GLB Act violation" (quoting *Moses*,

6      913 F.3d at 306-07)).    The Court joins Judge Rakoff and Judge

7      Cote in adopting this sound analysis.

8           The FTC adequately states a claim against the

9      individual defendant, Mr. Ehrlich, under the GLB Act.    The

10     Court adopts Judge Rakoff's reasoning in concluding that "the

11     same individual liability standard that applies under Section 5

12     of the FTCA" applies to alleged violations of the GLB Act.    *RCG*

13     *Advances,* 2023 WL 6281138, at *10; *see also* Mem. at 15 (the

14     Ehrlich defendants agreeing with this conclusion).

15     Mr. Ehrlich's liability as an individual defendant is

16     adequately pleaded for the reasons described earlier:    The FTC

17     has adequately pleaded that he had some knowledge and authority

18     to control Voyager's conduct, and that he participated directly

19     in the alleged violations.    Moreover, defendants allegedly made

20     these false representations about the financial services

21     Voyager offered —— including by misleadingly suggesting that

22     customers' deposits with Voyager were FDIC-insured, or "as safe

23     with [Voyager] as at a bank," Complaint par. 28, 32 —— in order

24     to obtain customers' bank account and cryptocurrency wallet

25     information.    *See also Celsius,* 2023 WL 8603064, at *5.    Thus,

O5GHFedO

1    the FTC has adequately pleaded that Mr. Ehrlich violated

2    Section 521 of the GLB Act.

3            4.   Injunctive Relief Under Section 13(b)

4            The FTC seeks (a) a permanent injunction to prevent

5    future FTC Act and GLB Act violations and (b) preliminary

6    injunctive and ancillary relief, among other things.  Complaint

7    par. 62.  Under Section 13(b) of the FTC Act, the FTC may seek

8    a preliminary injunction "whenever the Commission has reason to

9    believe — (1) that any person, partnership, or corporation is

10   violating, or is about to violate, any provision of law

11   enforced by the Federal Trade Commission . . . ."  15 U.S.C.

12   §53(b); *see also FTC v. Bronson Partners, LLC,* 654 F.3d 359,

13   365 (2d Cir. 2011) (acknowledging that Section 13(b) permits

14   the issuance of a permanent injunction).

15           The Second Circuit has not yet clarified the standard

16   under which the FTC may seek injunctive relief under Section

17   13(b).  But district courts in the Second Circuit that have

18   considered the issue have stated that for a permanent

19   injunction, the FTC must show "some cognizable danger of

20   recurring violation*," Med. Billers Network, Inc.,* 543 F. Supp.

21   2d at 323 (internal quotation marks and citations omitted), or

22   "some reasonable likelihood of future violations," *FTC v.*

23   *Minuteman Press*, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998)

24   (internal quotation marks and citations omitted); *see also RCG*

25   *Advances,* 2023 WL 6281138, at *14 (articulating the same

O5GHFedO

1    standard).

2            As Judge Holwell explained in *Med. Billers*:

3            "Some factors to consider in determining whether such

4    a danger exists include:  The defendants' scienter, whether the

5    conduct was isolated or recurrent, whether defendants are

6    positioned to commit future violations, the degree of consumer

7    harm caused by defendants, defendants' recognition of their

8    culpability, and the sincerity of defendants' assurances (if

9    any) against future violations."

10           543 F. Supp. 2d at 323 (citation omitted); *see also*

11   *id.* (finding a permanent injunction "warranted" where

12   "defendants knowingly made misrepresentations to consumers for

13   years and a large number of consumers [made purchases] based on

14   these misrepresentations" and "defendants do not recognize

15   their culpability, but continue to insist that their

16   representations were true, ignoring the obvious impressions

17   that they actually conveyed to consumers"); *RCG Advances*, 2023

18   WL 6281138, at *14 (listing similar factors, and concluding

19   that "in light of the egregiousness of [the individual

20   defendant's] conduct, the seriousness of the harm he inflicted

21   on consumers, his continuing denial of his role in the

22   misconduct, and the sheer number of times [the individual

23   defendant] engaged in misconduct, the Court has no trouble

24   finding a permanent injunction . . . to be appropriate").

25           Other courts in this district have adopted the factors

O5GHFedO

articulated in *SEC v. Commonwealth Chemical Securities, Inc.*,
574 F.2d 90, 100 (2d Cir. 1978), to assess the likelihood of
recurrence. *See, e.g., Celsius*, 2023 WL 8603064, at *4-5; *see
also FTC v. Roomster Corp.*, 654 F. Supp. 3d 244, 258 (S.D.N.Y.
Feb. 1, 2023). The *Commonwealth Chemical* factors are "the fact
that defendant has been found liable for illegal conduct; the
degree of scienter involved; whether the infraction is an
'isolated occurrence;' whether defendant continues to maintain
that his past conduct was blameless; and whether, because of
his professional occupation, the defendant might be in a
position where future violations could be anticipated." *See*
575 F.2d at 100 (internal quotation marks and citations
omitted).

  The Ehrlich defendants argue that "there is no
allegation that Voyager is presently accepting consumer
deposits or has any plans to begin accepting consumer deposits
again in the future," and "Voyager filed for bankruptcy in July
2022," so Voyager's assets are in liquidation. Mem. at 20-21.
And the Ehrlich defendants assert that Mr. Ehrlich is no longer
the CEO of Voyager. *Id.* at 21 (citing materials accompanying
Voyager's bankruptcy proceeding). The FTC argues that the
alleged violations are likely to recur because the complaint
alleged that Mr. Ehrlich is individually liable for violating
Section 5 of the FTC Act, that those violations were
"recurring" and not isolated — continuing from "2018 through

O5GHFedO

1    July 2022, including through direct communications to

2    consumers."  Dkt. No. 57 at 19.

3        The FTC argues that Mr. Ehrlich's violations "ceased

4    not because he decided to comply with the law, but because

5    Voyager declared bankruptcy."  *Id.*  And they alleged that

6    Mr. Ehrlich, as CEO, knew about the Corporate Defendants' (and

7    his own) conduct and the potential for consumer confusion, yet

8    made claims anyway regarding Voyager's supposed FDIC insurance.

9    *Id.*  And the FTC argues that Mr. Ehrlich's motion to dismiss

10   shows that he maintains his blamelessness.  *Id.*

11       Last, the FTC argues that Mr. Ehrlich has "the

12   background and qualifications to seek similar employment

13   elsewhere, work at another digital asset or financial services

14   company in the future, and make further misrepresentations

15   about the safety of consumer funds."  *Id.* at 20.

16       The FTC has adequately pleaded a plausible claim for

17   injunctive relief.  The complaint alleges a multi-year effort

18   by defendants to entice consumers to transfer their assets into

19   Voyager cryptocurrency accounts, and neither the USD Coin nor

20   Voyager itself were FDIC-insured, despite Voyager's repeated

21   references to FDIC insurance.  *See* Complaint par. 24-33.  The

22   FTC adequately pleaded that Mr. Ehrlich had at least some

23   knowledge of this conduct, participated directly in the

24   representations, and had authority to control the corporate

25   defendants.  Moreover, even upon receiving the email from MCB

O5GHFedO

in November 2021, defendants' misleading representations

continued.  *See id.* par. 31.  According to the complaint, they

continued further still after receiving the FDIC's

cease-and-desist letter in 2022.  *Id.* par. 39-40.  Defendants

have caused substantial consumer harm, it is alleged.  *See Med.*

*Billers*, 543 F. Supp. 2d at 323; Complaint par. 34-38.  And

Mr. Ehrlich continues to deny, they allege, his "role in the

[alleged] misconduct and maintains the means, ability, and

incentive to resume" it.  *See Celsius*, 2023 WL 8603064, at *5.

Namely, because of his professional background, Mr. Ehrlich

"might be in a position where future violations could be

anticipated," even if the company is in bankruptcy proceedings

and even if Mr. Ehrlich is no longer CEO.  *See Commonwealth*

*Chem.* 575 F.2d at 100.  Thus, the FTC has adequately pleaded

both "some cognizable danger of recurring violation," *Med.*

*Billers*, 543 F. Supp. at 323, and "some reasonable likelihood

of future violations," *Minuteman Press*, 53 F. Supp. 2d at 260;

*see also RCG Advances,* 2023 WL 6281138, at *14.  Accordingly,

the FTC has adequately pleaded its entitlement injunctive

relief.

     5.  Monetary Relief Under Section 19

     The FTC has adequately stated a claim for monetary

relief under Section 19 in connection with its GLB Act claim.

The Court adopts Judge Rakoff's reasoning in *RCG Advances* in

concluding that the FTC has the statutory authority to seek

O5GHFedO

1    monetary relief for GLB Act violations.  *See RCG Advances*,

2    2023 WL 6281138, at *11.  This is because:

3            "Section 522(a) of the GLB Act allows the FTC to

4    enforce Section 521 of the GLB Act . . . "in the same manner

5    and with the same power and authority" that the FTC "has under

6    the [FDCPA]."  *See* 15 U.S.C. §6822(a).  The FDCPA, meanwhile,

7    authorizes the FTC to use "all of [its] functions and powers .

8    . . under the FTCA" to enforce compliance with it.  15 U.S.C.

9    §16921(a).  Specifically, the FDCPA authorizes the FTC to treat

10   a violation of it "in the same manner as if the violation had

11   been a violation of a Federal Trade Commission trade regulation

12   rule."  *Id.*  And under Section 19 of the FTCA, this Court is

13   authorized "to grant such relief as [it] finds necessary to

14   redress injury to consumers . . . resulting from the rule

15   violation," including "the payment of damages."  15 U.S.C.

16   §57b(b).  Because GLB violations (like FDCPA violations) can be

17   treated like rule violations, the FTC can seek money damages

18   against [the individual defendant] under Section 19."

19           *Id.*; *see also Celsius*, 2023 WL 8603064 at *5 (adopting

20   Judge Rakoff's reasoning).  The same analysis applies here.

21   The FTC has adequately pleaded its request for monetary relief.

22           6.   The Relief Defendant

23           Mrs. Ehrlich is an appropriate relief defendant.  As

24   the Second Circuit stated in *FTC v. LeadClick Media, LLC*:

25           "Federal courts may order equitable relief against a

O5GHFedO

1    [relief defendant] not accused of wrongdoing . . . where that

2    person:  (1) has received ill-gotten funds; and (2) does not

3    have a legitimate claim to those funds.  District courts may

4    only require disgorgement of the assets of a relief defendant

5    upon a finding that she lacks a legitimate claim." while we

6    have not developed explicit guidelines for what qualifies as a

7    legitimate claim sufficient to immunize . . . property from

8    disgorgement, we have recognized that relief defendants who

9    have provided some form of valuable consideration in good faith

10   . . . are beyond the reach of the district court's disgorgement

11   remedy.  An outstanding loan from a relief defendant

12   constitutes valuable consideration, giving rise to a

13   "legitimate claim" to repayment . . . .  A gratuitous transfer,

14   however, without the payment of consideration, does not give

15   rise to a legitimate claim."

16        838 F.3d at 177 (internal quotation marks and

17   citations omitted).

18        The FTC meets this standard.  The FTC alleges that

19   Mrs. Ehrlich is married to Mr. Ehrlich, who "has transferred

20   millions of dollars" to her "or to financial instruments

21   benefiting" her, "including millions of dollars in proceeds

22   from the sale of Voyager stock and the sale of a home sold at a

23   discount to a trust in [her] name."  Complaint par. 12.  It

24   alleges that Mrs. Ehrlich "has received funds that can be

25   traced directly to defendants' deceptive acts or practices . .

O5GHFedO

1    . , and she has no legitimate claim to those funds." *Id.* She

2    allegedly "provided no services in exchange for the asset

3    received," and that "she is not a bona fide purchaser with

4    legal and equitable title to defendants' customers' funds

5    and/or other assets . . . ." *Id.* par. 59.

6         Accordingly, the FTC contends that Mrs. Ehrlich "has

7    received, directly or indirectly, funds and/or other assets

8    from defendants that are traceable to funds obtained from

9    defendants' customers through [their] deceptive, unfair, and/or

10   unlawful acts or practices," and that she'd be unjustly

11   enriched absent disgorgement. *Id.* par. 58–59.  This suffices

12   to adequately allege that Mrs. Ehrlich "(1) has received

13   ill-gotten funds; and (2) does not have a legitimate claim to

14   those funds." *See LeadClick Media*, 838 F.3d at 177.

15        B.  Motion to Strike

16        Because the Court finds that the FTC has adequately

17   pleaded these claims, the Ehrlich defendants' motion to strike

18   the FTC's requests for monetary and injunctive relief is

19   denied.

20        IV.  For the reasons I have just described,

21   Defendants' motion to dismiss is denied.  I will enter an order

22   later today or tomorrow memorializing today's decision.

23        Just as an aside, I understand that a notice of appeal

24   was recently filed in *RCG Advances* and that the Second Circuit

25   has not yet ruled in that case.  Should the Second Circuit rule

O5GHFedO

1    any differently regarding the FTC's ability to seek monetary

2    and injunctive relief under the GLB Act, defendants may, of

3    course, renew their motion to dismiss on that basis or may

4    pursue that issue through some other appropriate procedural

5    vehicle.

6            So I think that's it.  Thank you very much, counsel,

7    for your indulgence.

8            Is there anything else that we need to discuss today,

9    first counsel for plaintiff?

10           MR. GLASSMAN:  There is nothing else on our end, your

11   Honor.  Thank you very much.

12           THE COURT:  Thank you.

13           Counsel for defendants?

14           MS. KRISSOFF:  There is nothing else for the

15   defendants.  Thank you, your Honor.

16           THE COURT:  Very good.

17           Thank you all very much.  This proceeding is

18   adjourned.

19           (Adjourned)

20

21

22

23

24

25